# GROSSO *v.* UNITED STATES.

No. 12. Argued January 18, 1967.—Reargued October 10–11, 1967.—Decided January 29, 1968.

*Charles Alan Wright* reargued the cause for petitioner. With him on the briefs on the reargument and on the original argument was *James E. McLaughlin.*

*Francis X. Beytagh, Jr.,* reargued the cause for the United States, *pro hac vice.* With him on the brief on the reargument were *Acting Solicitor General Spritzer, Assistant Attorney General Vinson, Beatrice Rosenberg* and *Jerome M. Feit. Jack S. Levin* argued the cause for the United States on the original argument. On the brief were *Solicitor General Marshall, Assistant Attorney General Vinson, Miss Rosenberg* and *Theodore George Gilinsky.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

Petitioner was convicted in the United States District Court for the Western District of Pennsylvania of 15 counts of willful failure to pay the excise tax imposed on wagering by 26 U. S. C. § 4401, four counts of willful failure to pay the special occupational tax imposed by 26 U. S. C. § 4411, and one count of conspiracy to defraud the United States by evading payment of both taxes. 18 U. S. C. § 371. Petitioner moved before trial to dismiss the counts which charged conspiracy to defraud and failure to pay the excise tax, asserting that payment would have obliged him to incriminate himself, in violation of the privilege against self-incrimination guaranteed by the Fifth Amendment. He reiterated this contention in support of unsuccessful motions for acquittal after verdict and for a new trial. The Court of Appeals for the Third Circuit affirmed the conviction. 358 F. 2d 154.

Petitioner did not assert below, and therefore has not urged here, that his privilege was violated by reason of his convictions for conspiracy and for failure to pay the special occupational tax. He has contended only

that payment of the excise tax would have required him to incriminate himself, that he therefore may not properly be prosecuted for willful failure to pay the tax or for conspiracy to evade its payment, and that conduct of the trial court after submission of the case to the jury denied him a fair trial. We granted certiorari, 385 U. S. 810, and the case was argued with *Marchetti* v. *United States,* decided today, *ante,* p. 39.[1] For reasons which follow, we reverse.

## I.

We turn first to petitioner's contention that payment of the wagering excise tax would have compelled him to incriminate himself. We have summarized in *Marchetti, supra,* the various state and federal penalties which have been imposed upon wagering. It is enough now to reiterate that Pennsylvania, in which petitioner allegedly accepted wagers, has adopted a comprehensive statutory system for the punishment of gambling and ancillary activities. Pa. Stat. Ann., Tit. 18, §§ 4601–4607 (1963). These penalties, in combination with the federal statutes described in *Marchetti,* place petitioner entirely within "an area permeated with criminal statutes," where he is "inherently suspect of criminal activities." *Albertson* v. *SACB,* 382 U. S. 70, 79. The issues here are therefore

---

[1] After argument, the case was returned to the calendar, and set for reargument at the 1967 Term, again with *Marchetti, supra.* 388 U. S. 904. Counsel were asked to argue, in addition to the original questions, the following: "(1) What relevance, if any, has the required records doctrine, *Shapiro* v. *United States,* 335 U. S. 1, to the validity under the Fifth Amendment of the obligation to pay the wagering excise tax imposed by 26 U. S. C. § 4401? (2) Is satisfaction of an obligation to pay a wagering excise tax imposed by 26 U. S. C. § 4401 conditioned upon the filing of a return required under 26 U. S. C. § 6011 and pertinent regulations? If it is not, what information, if any, must accompany the payment of a wagering excise tax obligation in order to extinguish the taxpayer's liability for that obligation?"

whether payment of the excise tax would have provided information incriminating to petitioner, and, if it would have done so, whether petitioner is otherwise prevented from asserting the constitutional privilege.

The statutory scheme by which wagering is taxed is described in *Marchetti, supra.* Two additional observations are, however, required in order to assess fully the hazards of self-incrimination created by the wagering excise tax. First, those liable for payment of that tax are required to submit each month Internal Revenue Service Form 730. Treas. Reg. § 44.6011 (a)–1 (a). The return is expressly designed for the use only of those engaged in the wagering business; its submission, and the replies demanded by each of its questions, evidence in the most direct fashion the fact of the taxpayer's wagering activities. Although failures to pay the excise tax and to file a return are separately punishable under 26 U. S. C. § 7203, the two obligations must be considered inseparable for purposes of measuring the hazards of self-incrimination which might stem from payment of the excise tax. Nothing in the pertinent statutes or regulations contemplates payment of the tax without submission of the return,[2] and we are informed by the United States that if the return does not accompany the tax payment, "the money is not accepted." ` Brief for the United States on Reargument 39, n. 35. We must conclude that here, as in *Albertson,* the validity under the Constitution of criminal prosecutions for willful failure to pay the excise tax may properly be determined only after assessment of the hazards of incrimination which would result from "literal and full compliance" with all the statutory requirements. 382 U. S., at 78.

---

[2] Indeed, so far as the pertinent materials can be said to reflect any position, it is that a return must accompany a tax payment. See 26 U. S. C. § 6011; Treas. Reg. § 44.6011 (a)–1 (a).

66

Second, although there is no statutory instruction, as there is for the occupational tax, that state and local prosecuting officers be provided listings of those who have paid the excise tax, neither has Congress imposed explicit restrictions upon the use of information obtained as a consequence of payment of the tax. Moreover, it appears that the Revenue Service, evidently acting under the authority of certain general statutory provisions,[3] has undertaken to tender this information to interested prosecuting authorities.[4] We can only conclude that those liable for payment of the excise tax reasonably may expect that information obtainable from its payment, or from submission of Form 730, will ultimately be proffered to state and federal prosecuting officers.

In these circumstances, it would be impossible to say that the hazards of incrimination which stem from the obligation to pay the excise tax and to file Form 730 are "imaginary and unsubstantial." *Reg.* v. *Boyes,* 1 B. & S. 311, 330; *Brown* v. *Walker,* 161 U. S. 591, 599–600. The criminal penalties for wagering with which petitioner is threatened are scarcely "remote possibilities out of the ordinary course of law," *Heike* v. *United States,* 227 U. S. 131, 144; yet he is obliged, on pain of criminal prosecution, to provide information which

---

[3] The United States has suggested that the Commissioner has authority to make information obtained as a result of the excise tax available to prosecuting officers under 26 U. S. C. § 6103, 5 U. S. C. §§ 22, 1002 (c), and Treas. Reg. §§ 601.702 (a) (3) and (d). Brief for the United States on the original argument, p. 14, n. 10. But see Transcript of Record 101–102.

[4] See *State* v. *Mills,* 229 La. 758, 86 So. 2d 895; *State* v. *Baum,* 230 La. 247, 88 So. 2d 209; *Boynton* v. *State,* 75 So. 2d 211, 213; *United States* v. *Whiting,* 311 F. 2d 191, 193. And see Caplin, The Gambling Business and Federal Taxes, 8 Crime & Delin. 371, 372. Further, we note that the United States has acknowledged the "limited availability" of the excise tax returns, "in certain circumstances," to state and local officials. Brief on Reargument 33, n. 30.

would readily incriminate him, and which he may reasonably expect would be provided to prosecuting authorities. These hazards of incrimination can only be characterized as "real and appreciable." *Reg.* v. *Boyes, supra,* at 330; *Brown* v. *Walker, supra,* at 599–600. Moreover, unlike the income tax return at issue in *United States* v. *Sullivan,* 274 U. S. 259, petitioner's submission of an excise tax payment, and his replies to the questions on the attendant return, would directly and unavoidably have served to incriminate him; his claim of privilege as to the entire tax payment procedure was therefore neither "extreme" nor "extravagant." Compare, *id.,* at 263.

We are thus obliged to inquire whether petitioner is otherwise foreclosed from asserting the constitutional privilege. For reasons indicated in *Marchetti, supra,* we have found nothing in *United States* v. *Kahriger,* 345 U. S. 22, or *Lewis* v. *United States,* 348 U. S. 419, which now warrants the exclusion of this situation from the privilege's protection.[5] It need only be added that the requirements associated with the excise tax are directed wholly to past and present wagering activities; they lack even the illusory prospectivity which characterizes the special occupational tax and registration requirements.

Similarly, we have concluded that the "required records" doctrine, *Shapiro* v. *United States,* 335 U. S. 1, cannot be appropriately applied to these circumstances. See generally *Marchetti* v. *United States, supra.* The premises of the doctrine, as it is described in *Shapiro,* are evidently three: first, the purposes of the United

---

[5] It is useful to note that the validity under the Fifth Amendment of the wagering excise tax was not at issue in either *Kahriger* or *Lewis*; *Lewis* involved an information which charged a willful failure to pay the occupational tax, and *Kahriger* an information which charged willful failures both to register and to pay the occupational tax.

States' inquiry must be essentially regulatory; second, information is to be obtained by requiring the preservation of records of a kind which the regulated party has customarily kept; and third, the records themselves must have assumed "public aspects" which render them at least analogous to public documents. There is no need for present purposes to examine the relative significance of these three factors, or to undertake to define more specifically their incidents, for both the first and third factors are plainly absent from this case.

Here, as in *Marchetti*, the statutory obligations are directed almost exclusively to individuals inherently suspect of criminal activities. The principal interest of the United States must be assumed to be the collection of revenue, and not the prosecution of gamblers, *United States* v. *Calamaro*, 354 U. S. 351, 358; but we cannot ignore either the characteristics of the activities about which information is sought, or the composition of the group to which the inquiries are made. These collateral circumstances, in combination with Congress' apparent wish that any information obtained as a consequence of the wagering taxes be made available to prosecuting authorities, readily suffice to distinguish these requirements from those at issue in *Shapiro*. Moreover, the information demanded here lacks every characteristic of a public document. No doubt it is desired by the United States, but we have concluded, for reasons indicated in *Marchetti*, that this alone does not render information "public," and thus does not deprive it of constitutional protection.

We must note that the pertinent Treasury regulations provide that the replies to the questions included on Form 730 are to be compiled each month "from the daily records required by §§ 44.4403–1 and 44.6001–1." Treas. Reg. § 44.6011 (a)–1 (a). It might therefore be argued that Form 730 is merely a monthly abstract of

records essentially similar to those required to be preserved by the regulations in *Shapiro*. The difficulties with this argument are two. First, it is scarcely plain that the records required here are "of the same kind [the taxpayer] has customarily kept." 335 U. S., at 5, n. 3. Second, and more important, there are, as we have indicated, other points of significant dissimilarity between this situation and that in *Shapiro*. We have concluded that in combination these points of difference preclude any appropriate application to these circumstances of the "required records" doctrine.

Finally, as in *Marchetti*, we have been urged by the United States to permit continued enforcement of the wagering excise tax requirements by imposing restrictions upon the use by state and federal authorities of information obtained as a consequence of payment of the tax. We recognize that § 6107 (see *Marchetti, supra,* at 59, n. 15) is not by its terms applicable to the excise tax, and that there is no similar statutory obligation that the Commissioner provide prosecutors with listings of those who have paid the excise tax. Nonetheless, it would be inappropriate to impose such restrictions upon one portion of a statutory system, when we have concluded that it would be improper, for reasons discussed in *Marchetti*, to do so upon "an integral part" [6] of the same system. We therefore decline to impose the restrictions urged by the United States.

## II.

There remain for disposition the substantive counts for willful failure to pay the occupational tax, and the count for conspiracy to defraud.[7] The latter was bot-

---

[6] H. R. Rep. No. 586, 82d Cong., 1st Sess., 60.

[7] Section 4411 provides that the occupational tax must be paid "by each person who is liable for tax under section 4401" and by each person who receives wagers for one liable under § 4401. It

tomed on allegations that petitioner had conspired to evade payment both of the excise tax and of the occupational tax. Petitioner has consistently contended that the constitutional privilege should have prevented his conviction on the conspiracy count, evidently on the basis that, insofar as it is founded on his failure to pay the excise tax, this count raises questions identical with those presented by the substantive counts for failure to pay that tax. We agree, and conclude that a taxpayer may not be convicted of conspiracy to evade payment of the tax, if the constitutional privilege would properly prevent his conviction for willful failure to pay it. Cf. *Marchetti* v. *United States, supra,* at 60–61.

Petitioner has not, however, asserted a claim of privilege either as to the counts which charged willful failure to pay the occupational tax, or as to the allegation that he conspired to evade payment of the occupational tax.[8]

_____

might therefore be argued that since petitioner is entitled to claim the constitutional privilege in defense of a prosecution for willful failure to pay the excise tax, he is thereby freed from liability for the occupational tax. We cannot accept such an argument. We do not hold today either that the excise tax is as such constitutionally impermissible, or that a proper claim of privilege extinguishes liability for taxation; we hold only that such a claim of privilege precludes a criminal conviction premised on failure to pay the tax.

[8] It should be noted that petitioner's trial counsel did once assert, in colloquy with the trial judge, that "We contended and have always contended—and if required to go on appeal will continue to contend—that the requirements of this Act in requiring you to pay this excise tax and take out the stamp are a violation of the privilege against self incrimination." The court then inquired, "You are raising the Constitutional question of the validity of the law?" Petitioner's counsel replied, "That is right." Transcript of Record 33. Petitioner did not, however, challenge his obligation to pay the occupational tax either in any of his various motions or in any of his other arguments, here or in the courts below.

Given the decisions of this Court in *Kahriger* and *Lewis*, *supra*, which were on the books at the time of petitioner's trial, and left untouched by *Albertson* v. *SACB*, *supra*, we are unable to view his failure to present this issue as an effective waiver of the constitutional privilege. By the same token, we do not think that we can well reach these counts on the theory of "plain error."

It might, therefore, be thought that the proper disposition of the substantive occupational tax counts, and of the portion of the conspiracy count concerned with the occupational tax, would be to vacate, rather than to reverse, the judgments of conviction, and to return the case to the lower courts for further proceedings consistent with our opinions in this case and in *Marchetti*.

We think, however, that a different course is indicated. Under 28 U. S. C. § 2106 [9] we have power to dispose of this case "as may be just under the circumstances." See *Yates* v. *United States*, 354 U. S. 298, 327–331. Since the record is barren of any evidence on which a finding of waiver of the privilege against self-incrimination might properly be predicated, and since, absent such a waiver, reversal of the conviction would be inevitable in light of our holdings today in this case and in *Marchetti*, we consider that the entire case should now be finally disposed of at this level. In the special circumstances presented, this course seems to us to be dictated by considerations of sound judicial administration, in

---

[9] Section 2106 provides that "The Supreme Court . . . may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."

order to obviate further and entirely unnecessary proceedings below.[10]  Cf. *Yates* v. *United States, supra.*

Accordingly, the judgment of the Court of Appeals is reversed in its entirety.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE BRENNAN, concurring.*

I join the opinions of the Court in these cases.  I write only to emphasize why, in my view, nothing we decide or say today in any wise impairs or modifies *United States* v. *Sullivan,* 274 U. S. 259, and *Shapiro* v. *United States,* 335 U. S. 1.

The privilege against self-incrimination does not bar the Government from establishing every program or scheme featured by provisions designed to secure information from citizens to accomplish proper legislative purposes.  Congress is assuredly empowered to construct a statutory scheme which either is general enough to avoid conflict with the privilege, or which assures the necessary confidentiality or immunity to overcome the privilege.  See *Adams* v. *Maryland,* 347 U. S. 179; *Reina* v. *United States,* 364 U. S. 507.  True, some of the values protected by the self-incrimination guaranty may well be affected to an extent by any enforced system of information gathering based upon individual participation, see *Murphy* v. *Waterfront Commission,* 378 U. S. 52, 55, but it is clear that the scope of the privilege does not coincide with the complex of values it helps to protect.

---

[10] In light of this disposition, we find it unnecessary to reach petitioner's alternative contention, that conduct of the trial judge after submission of the case to the jury prevented a fair trial.

*[This opinion applies also to No. 2, *Marchetti* v. *United States, ante,* p. 39.]

Despite the impact upon the inviolability of the human personality, and upon our belief in an adversary system of criminal justice in which the Government must produce the evidence against an accused through its own independent labors, the prosecution is allowed to obtain and use evidence offered by the accused "in the unfettered exercise of his own will," *Malloy* v. *Hogan,* 378 U. S. 1, 8, and evidence which although compelled is generally speaking not "testimonial," *Schmerber* v. *California,* 384 U. S. 757, 761. Moreover, by the simple expedient of granting appropriate immunity the Government is able to surmount entirely the self-incrimination barrier, despite the value of privacy that provision is intended to protect.

*United States* v. *Sullivan, supra,* makes clear that an individual is not exempted, by the fact that he may be privileged to refuse to answer some questions, from a requirement, "directed at the public at large," of filing an income tax return exclusively containing questions "neutral on their face." *Albertson* v. *SACB,* 382 U. S. 70, 79. *Shapiro* v. *United States, supra,* involved a similar situation; it involved a record-keeping requirement pursuant to a neutral governmental system of price regulation.

On the other hand, we know that where the governmental scheme clearly evidences the purpose of gathering information from citizens in order to secure their conviction of crime, it contravenes the privilege. Thus in *Albertson* v. *SACB, supra,* we held invalid both the requirement that Communist Party members file a registration form and that they complete and file a registration statement under the Subversive Activities Control Act of 1950. We distinguished *Sullivan,* stating that the questions on the forms in *Albertson* "are directed at a highly selective group inherently suspect of criminal activities," and that the privilege is asserted, not "in

an essentially non-criminal and regulatory area of inquiry, but against an inquiry in an area permeated with criminal statutes, where response to any of the form's questions in context might involve the petitioners in the admission of a crucial element of a crime." *Id.*, at 79.

The cases before us present a statutory system condemned by *Albertson.* The wagering excise tax, the occupational tax, and the registration requirement are only parts of an interrelated statutory system for taxing illegal wagers. Whatever else Congress may have meant to achieve, an obvious purpose of this statutory system clearly was to coerce evidence from persons engaged in illegal activities for use in their prosecution. See *United States* v. *Kahriger,* 345 U. S. 22, 37 (Frankfurter, J., dissenting).

The Court's opinions fully establish the statutory system's impermissible invasions of the privilege. Indeed, 26 U. S. C. § 4401 should create substantial suspicion on privilege grounds simply because it is an excise tax upon persons "engaged in the business of accepting wagers" or who conduct "any wagering pool or lottery." The persons affected by this language are a relatively small group, many of whom are engaged in activities made unlawful by state and federal statutes. But § 4401 is actually even more directly confined to that group. Section 4402 (1) exempts from the tax wagers placed with a parimutuel wagering enterprise "licensed under State law," and § 4421 defines "wager" to exclude most forms of unorganized gambling such as dice and poker, and defines "lottery" to exclude commonly played games such as bingo and drawings conducted by certain tax-exempt organizations. The effect of these exceptions is to limit the wagering excise tax under § 4401 almost exclusively to illegal, organized gambling.

Moreover, the code contemplates extensive record-keeping reporting by persons obligated to pay the tax.

But these are records and reports which would incriminate overwhelmingly. Section 6011 (a) requires any person liable to pay a tax to file a return in accordance with the forms and regulations promulgated by the Secretary or his delegate. The regulations promulgating record-keeping requirements and the requirement that taxpayers make a monthly return on Form 730, Treas. Reg. § 44.6011 (a)–1(a), were therefore formulated pursuant to specific congressional authority. That the return is intended to be a part of the wagering tax obligation is clear from the face of the return itself. Immediately under Form 730's title "TAX ON WAGERING" is a reference to "(Section 4401 of the Internal Revenue Code)," and in at least three places the return indicates that "this form must be filed, *with remittance,* with the District Director of Internal Revenue." † (Emphasis added.)

Thus § 4401 requires that taxpayers send the Government every month both the tax due and the completed Form 730. That much can start them on the road to prison. The Service then is free to take various steps to assure that it does. It may investigate such taxpayers. It may subpoena taxpayers' records to ascertain whether the payments are accurate. It can and does pass on for use by prosecuting authorities the facts of payments and filing and any other evidence uncovered. These many, substantial dangers easily satisfy the test for incrimination fashioned by our cases.

Of course the privilege does not guarantee anonymity. The question in these cases, however, is not whether all governmental programs which require citizens to expose

---

†The instructions on Form 730 state that the "[r]eturn, with remittance, covering the tax due under section 4401 for any calendar month must be in the hands of the District Director . . . on or before the last day of the succeeding month . . . ."

their identity are invalid, but whether this statutory system, designed primarily for and utilized to pierce the anonymity of citizens engaged in criminal activity, is invalid. The privilege does guarantee anonymity from inquiries so designed, when the risks are not wholly fanciful. And the risks here are obvious and real. A list of persons who comply with § 4401 every month is invaluable to prosecuting authorities. It must frequently provide the clinching link in the chain of conviction.

We must take this statute as it is written and as it has been applied. Both the statute and the practice under it clearly further a congressional purpose to gather evidence from citizens in order to secure their conviction of crime. There undoubtedly will be other statutes and practices as to which this determination will be more difficult to make. These cases, however, present a statutory system manifesting a patent violation of the privilege. That system must be dealt with uncompromisingly to protect against encroachment of the privilege and to encourage legislative care and concern for its continuing vitality.

MR. JUSTICE STEWART, concurring.*

If we were writing upon a clean slate, I would agree with the conclusion reached by THE CHIEF JUSTICE in these cases.[1] For I am convinced that the Fifth Amendment's privilege against compulsory self-incrimination was originally meant to do no more than confer a testimonial privilege upon a witness in a judicial proceeding.[2] But the Court long ago lost sight of that original mean-

---

*[This opinion applies also to No. 2, Marchetti v. United States, ante, p. 39.]

[1] And in Haynes v. United States, post, p. 85.

[2] That, after all, is what the clause says:

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

ing. In the absence of a fundamental re-examination of our decisions, the most relevant recent one being *Albertson* v. *SACB*, 382 U. S. 70, I am compelled to join the opinions and judgments of the Court.

MR. CHIEF JUSTICE WARREN, dissenting.*

The Court today strikes down as unconstitutional a statutory scheme enacted by Congress to make effective and enforceable taxes imposed on wagers and the occupation of gambling. In so doing, it of necessity overrules *United States* v. *Kahriger,* 345 U. S. 22 (1953), and *Lewis* v. *United States,* 348 U. S. 419 (1955). I cannot agree with the Court's conclusion on the constitutional questions presented, and I would affirm the convictions in these two cases on the authority of *Kahriger* and *Lewis.*

In addition to being in disagreement with the Court on the result it reaches in these cases, I am puzzled by the reasoning process which leads it to that result. The Court professes to recognize and accept the power of Congress legitimately to impose taxes on activities which have been declared unlawful by federal or state statutes. Yet, by its sweeping declaration that the congressional scheme for enforcing and collecting the taxes imposed on wagers and gamblers is unconstitutional, the Court has stripped from Congress the power to make its taxing scheme effective. A reading of the registration requirement of 26 U. S. C. § 4412, as implemented by Internal Revenue Service Form 11–C, reveals that the 'information demanded of gamblers is no more than is necessary to assure that the tax-collection process will be effective. Registration of those liable for special taxes is a common and integral feature of the tax laws. See 26 U. S. C.

---

*[This opinion applies also to No. 2, *Marchetti* v. *United States, ante,* p. 39.]

§ 7011.[1]  So also is the requirement of public disclosure.[2]
And the reach of the registration and disclosure require-
ments extends to both lawful and unlawful activities.
Because registration and disclosure are so pervasive in
the Internal Revenue Code, it is clear that such require-
ments have been imposed by Congress to aid in the col-
lection of taxes legitimately levied.  Because most forms
of gambling have been declared illegal in this country,
gamblers necessarily operate furtively in the dark shad-
ows of the underworld.  Only by requiring that such
individuals come forward under pain of criminal sanc-
tions and reveal the nature and scope of their activities
can Congress confidently expect that revenue derived
from that outlawed occupation will be subject to the
legitimate reach of the tax laws.  Indeed, it seems to me
that the very secrecy which surrounds the business of
gambling demands disclosure.  Those legislative com-
mittees and executive commissions which have studied
the problems of illicit gambling activities have found
it impossible to determine with any precision the gross
revenues derived from that business.  For example, the
President's Commission on Law Enforcement and Ad-
ministration of Justice reported:

> "There is no accurate way of ascertaining orga-
> nized crime's gross revenue from gambling in the
> United States.  Estimates of the annual intake have
> varied from $7 to $50 billion. . . .  While the Com-

---

[1] It is true that the Internal Revenue Code also imposes special
registration requirements in connection with some of the special taxes.
See the registration sections collected in 26 U. S. C. § 7012.  How-
ever, the special registration requirements differ only in degree, and
not in kind, from the provisions of § 7011.

[2] Among the more general public disclosure provisions of the
Revenue Code are § 6103 (f) (list of taxpayers); § 6104 (returns of
certain tax-exempt organizations); and § 6105 (lists of those who
have been granted excess profit relief).

mission cannot judge the accuracy of these figures, even the most conservative estimates place substantial capital in the hands of organized crime leaders." President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Organized Crime 3 (1967).[3]

The Commission's observation is doubly revealing. It shows that the business of gambling is a lucrative revenue source. And it demonstrates the need for an enforceable disclosure device, such as the registration requirement of § 4412, if the revenue potential is to be realized. No one denies that the disclosures demanded by § 4412 can also be useful to law enforcement officials and that the very process of disclosure may have a regulatory effect on gamblers and their operations.[4] But this Court has

---

[3] Other reports are similarly indefinite concerning the precise amount of revenue realized by organized crime from illicit gambling operations. Thus, a Senate report could be no more exact than to describe unlawful gambling activities as "a multibillion dollar racket." Permanent Subcommittee on Investigations of the Senate Committee on Government Operations, Gambling and Organized Crime, S. Rep. No. 1310, 87th Cong., 2d Sess., 43 (1962). The President's Commission on Crime in the District of Columbia reported that "over 100 million dollars is bet annually on 'numbers' and sports events" in the Washington metropolitan area. The Commission relied for its figures on information supplied by Sheldon S. Cohen, Commissioner of Internal Revenue. Report of the President's Commission on Crime in the District of Columbia 112 (1966).

[4] Investigations by congressional committees have established that gambling revenue provides a principal source of revenue for organized crime in this country. See S. Rep. No. 1310, 87th Cong., 2d Sess., 43 (1962); S. Rep. No. 141, 82d Cong., 1st Sess., 11 (1951). Some congressmen may well have been motivated by a desire to control and curtail organized crime in enacting the tax laws challenged in these cases. However, it is not the task of this Court to examine such motives in ruling on the constitutionality of such laws, and the Court today has wisely declined to engage in any motive-searching inquiries.

repeatedly recognized that "a tax is not any the less a tax because it has a regulatory effect." *Sonzinsky* v. *United States,* 300 U. S. 506, 513 (1937). See also *License Tax Cases,* 5 Wall. 462 (1867).

In declaring the registration requirements of § 4412 invalid, the Court places principal reliance on *Albertson* v. *SACB,* 382 U. S. 70 (1965). But there is a critical distinction between that case and the cases decided today. In *Albertson,* the Court dealt with a registration requirement which clashed head-on with protected First Amendment rights and which could be viewed as serving no substantial governmental purpose in light of the curtailment of those rights.[5] These elements are notably lacking in the cases decided today. The occupation of gambling can in no sense be called a "protected" activity. The only claim that those engaged in gambling make is that they are somehow entitled to have their activities shrouded in secrecy and shielded from disclosure. Nothing in the Constitution compels such a result. And there is clearly a legitimate tax purpose in demanding that gamblers make the disclosures required by § 4412 and Form 11–C. Disclosure by means of registration is routinely required under the tax laws of those engaged in legitimate and lawful business enterprises. See, *e. g.,* 26 U. S. C. §§ 4101, 4222, 5502, 5802. Cf. *Shapiro* v. *United States,* 335 U. S. 1 (1948). To relieve gamblers of the registration requirement is to create for those

---

[5] I recognize that *Albertson* was decided on Fifth Amendment grounds without reaching the petitioners' First Amendment claims. 382 U. S., at 73–74 and n. 6. However, in applying the *Albertson* holding to the facts of these cases, it cannot be overlooked that the registration requirement in *Albertson* was directed at the petitioners' organizational affiliations which were arguably protected by the First Amendment. See *United States* v. *Robel,* 389 U. S. 258 (1967). There is no such First Amendment issue lurking in the cases decided today. The operative fact upon which the registration requirement of § 4412 depends is an individual's status as a gambler.

engaged in that occupation a special constitutional privilege of nonregistration.

In view of these considerations, I cannot understand why the Court today finds it necessary to strike down the registration requirement of § 4412 directed at those who derive their income from gambling. What seems to trouble the Court is not that registration is required but that the information obtained through the registration requirement is turned over by federal officials, under the statutory compulsion of 26 U. S. C. § 6107,[6] to state prosecutors to aid them in the enforcement of state gambling laws. If that is the source of the Court's Fifth Amendment concern, then constitutional adjudication demands that the provisions of § 6107 be the focus of the Court's decision. It does not seem reasonable to me to rule that, because information derived from the registration provisions of § 4412 must be made available to state prosecutors under § 6107, the registration requirements suffer from a fatal constitutional infirmity, even though § 4412 is a necessary and proper means of assuring that the occupational tax on gamblers will be enforceable. Certainly no Fifth Amendment issue arises from the fact of registration until an effort is made to use the registration procedure in aid of criminal prosecution. To the extent that the disclosure requirements of § 6107 would raise a Fifth Amendment problem because some of the names on the public list have admitted unlawful activities, that statutory provision is severable for purposes of constitutional adjudication. In fact, in the Internal Revenue Code itself, Congress has specifically enacted a severability clause. Section 7852 (a) of Title 26 pro-

---

[6] The Court points out in *Grosso* v. *United States* that the disclosure requirements of § 6107 do not extend to the excise tax provisions of § 4401. But, by administrative practice, the identity of those who pay the excise tax on wagers is made known to state prosecuting officials. *Ante,* at 66.

vides: "If any provision of this title, or the application thereof to any person or circumstances, is held invalid, the remainder of the title, and the application of such provision to other persons or circumstances, shall not be affected thereby." That clause represents a clear statutory command to this Court to wield its constitutional knife surgically, concentrating on the suspect provisions of § 6107 rather than bludgeoning the entire taxing scheme. The Court cannot evade this constitutional and statutory duty, as it seems to do, by labeling every provision of the wagering tax statutes as "interrelated" or "integral."

There is no such narrow focus to the Court's approach to these two cases. In fact, the Court impliedly rejects such an approach in dealing with the Government's suggestion that the taxing scheme at issue be saved from constitutional interment by imposing a use restriction on the information derived from registration under § 4412. Cf. *Murphy* v. *Waterfront Commission*, 378 U. S. 52 (1964). The Court finds such a limitation unacceptable because the legislative history of the wagering tax system reveals a congressional purpose to make available to state and local law enforcement officials the disclosures made through registration. The Court reasons that to impose the use restriction would be to defeat the congressional purpose, and it finds the suggested saving device unacceptable. But realistically the Court's sweeping constitutional ruling has the effect of frustrating two congressional purposes—the disclosure purpose and the revenue purpose. Such a result can hardly be justified on the ground of according a congressional purpose the deference due it by this Court. Conceding that the statutory scheme is intended to assist law enforcement, the fact that taxes in the sum of $115,000,000 have flowed from the wagering tax scheme to the Treasury in the past several years is convincing evidence of a legitimate

tax purpose. The congressional intent to assist law enforcement should not be the excuse for frustrating the revenue purpose of the statutes before the Court. Regardless of legislative intent, this Court has in the past refused "to formulate a rule of constitutional law broader than is required." *Garner* v. *Louisiana,* 368 U. S. 157, 163 (1961); cf. *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 186, n. 43 (1963). This principle should prevail in this case where the Act has the wholesome objective of devising workable procedures to assure that gamblers will pay the same taxes on their profits as other citizens are compelled to pay.

I apprehend that the Court, by unnecessarily sweeping within its constitutional holding the registration requirements of § 4412, is opening the door to a new wave of attacks on a number of federal registration statutes whenever the registration requirement touches upon allegedly illegal activities. As I noted above, registration is a common feature attached to a number of special taxes imposed by Title 26. For example, the following provisions impose special registration requirements: § 4101 (those subject to the tax on petroleum products); § 4222 (registration regarding certain tax-free sales by manufacturers); § 4722 (those engaged in dealing in narcotic drugs); § 4753 (those who deal in marihuana); § 4804 (d) (manufacturers of white phosphorous matches); §§ 5171–5172 (registration of distilleries); § 5179 (registration of stills); § 5502 (manufacturers of vinegar); § 5802 (importers, manufacturers, and dealers in firearms). And § 7011 imposes a general registration requirement on all those liable for other special taxes.[7] Heretofore this

---

[7] For example, the following sections impose occupational taxes and subject the taxpayer to the registration requirements of § 7011: § 4461 (those who maintain for use or permit use of coin-operated amusement or gaming devices); §§ 4721 and 4702 (a) (2) (C) (those who deal in narcotic drugs); § 4751 (dealers in marihuana); § 4821 (manufacturers or dealers in renovated or adulterated butter);

Court has consistently upheld the validity of such registration requirements, without regard to the legality of the activity being taxed. *United States* v. *Sanchez,* 340 U. S. 42 (1950) (26 U. S. C. § 4753); *Sonzinsky* v. *United States,* 300 U. S. 506 (1937) (26 U. S. C. § 5841); *Nigro* v. *United States,* 276 U. S. 332 (1928) (26 U. S. C. § 4722). The implications of the Court's decisions today also extend beyond the tax statutes. For example, the statute requiring narcotics addicts and violators to register whenever they enter or leave the country, 18 U. S. C. § 1407, can now be expected to come under attack. My concern that such registration requirements will now come under attack is not imaginary. This very day the Court, adhering to its decisions in *Marchetti* and *Grosso,* declares unconstitutional in *Haynes* v. *United States, post,* p. 85, 26 U. S. C. § 5851, which makes unlawful the possession of a firearm not registered under § 5841.[8] The impact of that decision on the efforts of Congress to enact much-needed federal gun control laws is not consistent with national safety. In my view, the Court has failed to take account of these relevant implications in the very broad holdings of today's decisions.

---

§ 4841 (manufacturers or dealers in filled cheese); § 5081 (those who rectify distilled spirits or wines); § 5091 (brewers of beer); § 5101 (manufacturers of stills); and § 5111 (wholesale dealers in liquors, wines, and beer); § 5121 (retail dealers in liquors, wines, and beer); and § 5801 (dealers in certain firearms). The registration requirement applies uniformly to those engaged in such occupations lawfully and those whose activities would make them liable to criminal penalties.

[8] The petition for a writ of certiorari in *Haynes* was filed on March 11, 1967, almost a year after this Court granted a writ of certiorari in *Costello* v. *United States* (the companion case to *Marchetti*). In granting the writ, the Court stipulated as the sole question in *Costello* whether *Kahriger* and *Lewis* should be overruled. 383 U. S. 942. There can be little doubt that the Court's specification of the question for argument in *Costello* prompted the Fifth Amendment challenge in *Haynes.*