**UNITED STATES of America**

v.

**John P. McCARTHY, a/k/a Jack McCarthy, and Louis Basis, Defendants.**

No. 67 Cr. 217.

United States District Court
S. D. New York.

April 1, 1969.

Robert M. Morgenthau, U. S. Atty., for Southern Dist. of New York, for United States, Elkan Abramowitz, Asst. U. S. Atty., of counsel.

Carl J. Rubino, New York City, for defendants.

Irving Anolik, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

Two defendants, John P. McCarthy and Louis Basis, are named in a 38-count indictment which has as its general subject allegedly unlawful payments from an agent or representative of management to a labor union officer. The first count charges a conspiracy to violate 29 U.S.C. § 186.[1] It alleges that Basis, "a labor relations expert, adviser and consultant" to the Bressner Colorvision Corporation and the Capehart Corporation, conspired with McCarthy, an officer of a union representing employees of those corporations, to pay the latter money "through" another corporation called National Consultants Associated, Ltd.

Counts 2 through 18 are substantive charges against Basis. They charge him with the making of specified payments to McCarthy contrary to 29 U.S.C. § 186. Counts 19 through 35, the other side of the same coin, charge McCarthy with violating the same statute by accepting and receiving those same payments.

Count 36 charges that McCarthy "unlawfully, wilfully and knowingly" failed to file with the Secretary of Labor a "signed report listing and describing the payments of money and other things of value received by [him] during * * * 1961 directly and indirectly from a person who acted as a labor relations consultant * * *." Count 37 charges a similar crime with respect to alleged payments received during 1962. Both of these counts are laid under the reporting provisions of the Landrum-Griffin Act of

---

1. The cited statute provides:

"(a) It shall be unlawful for any employer * * * or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interests of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

"(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

"(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

\* \* \* \* \*

"(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

"(b) (1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

\* \* \* \* \*

"(d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both."

1959, codified in 29 U.S.C. §§ 432(a), 437 (b) and 439(a).[2]

The last count, 38, also charges a crime by McCarthy under the Landrum-Griffin reporting requirements—specifically, 29 U.S.C. §§ 432(a) and 439(b)—in that he "did knowingly fail" in a required report to the Secretary, filed on March 9, 1965, to disclose payments and other things of value received in 1961 and 1962 from National Consultants Associated, Ltd.

In a compendious motion to dismiss, defendants raised an array of questions, at least two or three of which were (and are) substantial. Judge Cannella denied the motion on February 19, 1968, and denied reargument on May 13, 1968, but provided that his rulings were made, in specified respects, "without prejudice to a renewal before the trial judge." The case has been assigned to a trial judge; the opportunity for renewal has been seized; and the time has come to decide, at least, whether the last three counts of the indictment should be tried or dismissed.

■ Pressing a contention first made nearly two years ago in his motion to

2. § 432(a) provides:

"(a) Every officer of a labor organization and every employee of a labor organization (other than an employee performing exclusively clerical or custodial services) shall file with the Secretary a signed report listing and describing for his preceding fiscal year—

"(1) any stock, bond, security, or other interest, legal or equitable, which he or his spouse or minor child directly or indirectly held in, and any income or any other benefit with monetary value (including reimbursed expenses) which he or his spouse or minor child derived directly or indirectly from, an employer whose employees such labor organization represents or is actively seeking to represent, except payments and other benefits received as a bona fide employee of such employer;

"(2) any transaction in which he or his spouse or minor child engaged, directly or indirectly, involving any stock, bond, security, or loan to or from, or other legal or equitable interest in the business of an employer whose employees such labor organization represents or is actively seeking to represent;

"(3) any stock, bond, security, or other interest, legal or equitable, which he or his spouse or minor child directly or indirectly held in, and any income or any other benefit with monetary value (including reimbursed expenses) which he or his spouse or minor child directly or indirectly derived from, any business a substantial part of which consists of buying from, selling or leasing to, or otherwise dealing with, the business of an employer whose employees such labor organization represents or is actively seeking to represent;

"(4) any stock, bond, security, or other interest, legal or equitable, which he or his spouse or minor child directly or indirectly held in, and any income or any other benefit with monetary value (including reimbursed expenses) which he or his spouse or minor child directly or indirectly derived from, a business any part of which consists of buying from, or selling or leasing directly or indirectly to, or otherwise dealing with such labor organization;

"(5) any direct or indirect business transaction or arrangement between him or his spouse or minor child and any employer whose employees his organization represents or is actively seeking to represent, except work performed and payments and benefits received as a bona fide employee of such employer and except purchases and sales of goods or services in the regular course of business at prices generally available to any employee of such employer; and

"(6) any payment of money or other thing of value (including reimbursed expenses) which he or his spouse or minor child received directly or indirectly from any employer or any person who acts as a labor relations consultant to an employer, except payments of the kinds referred to in section 186(c) of this title."

§ 437(b)—prior to an amendment in 1965, 79 Stat. 888, which could not apply here and would have made no difference in any event—provided:

"Each person required to file a report under section * * * 432 * * * of this title shall file such report within ninety days after the end of each of its fiscal years * * *."

§ 439(a) provides:

"Any person who willfully violates [the foregoing provisions] shall be fined not more than $10,000 or imprisoned for not more than one year, or both."

dismiss, defendant McCarthy urges that his privilege under the Fifth Amendment against self-incrimination bars at the threshold his prosecution on these three counts. The argument was decisively enhanced in January 1968 when the Supreme Court decided Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889; Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906, and Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923. The principles of those cases now require dismissal of Counts 36 and 37. Count 38, however, charging a false report rather than failure to report, is not similarly vulnerable. On that final count defendant McCarthy must stand trial.

By § 505 of the Landrum-Griffin Act of 1959, § 302(a) of the Labor-Management Relations (Taft-Hartley) Act of 1947, 29 U.S.C. § 186(a) was amended to provide that anyone "who acts as a labor relations expert, adviser, or consultant to an employer" is forbidden "to pay * * * or deliver * * * any money or other thing of value * * * to * * * any officer or employee [of a labor organization] which represents * * * any of the employees of such employer * * *." [3] Subsection (b) of the same amended statute makes it "unlawful for any person to request, demand, receive, or accept, or agree to receive or accept any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) * * *." The first count, outlined above, alleging a conspiracy to violate 29 U.S.C. § 186, charges as overt acts a series of outlawed payments and receipts in 1961 and 1962. Then, as noted above, Counts 2 through 18 charge defendant Basis with paying, and Counts 19 through 35 charge defendant McCarthy with receiving, 17 such payments in 1962.

Thus, Counts 36 and 37 charge McCarthy in substance with the crimes of

failing to report the crimes alleged in Counts 1 and 19–35. These failure-to-report counts, as Judge Cannella observed, were at least seriously questionable before Marchetti, Grosso, and Haynes. Since those decisions, it seems quite clear that the reporting requirements "may not be employed to punish criminally those persons [like McCarthy] who have defended a failure to comply with their requirements with a proper assertion of the privilege against self-incrimination." Marchetti v. United States, 390 U.S. at 42, 88 S.Ct. at 699, 19 L.Ed.2d 889.

■ This conclusion would appear to be inescapable as a consequence of what the Landrum-Griffin Act and the indictment before the court say in plain terms. It is a federal crime for a labor union officer to receive money from an adviser or consultant of an employer by whom members of the union are employed. 29 U.S.C. § 186(b). The same Act which creates that particular crime announces a reporting requirement designed, primarily and centrally, to compel reports from union officers of any receipts thus proscribed. 29 U.S.C. §§ 432(a) and 437 (b). And the Act also declares it a crime, charged here in Counts 36 and 37, to fail to file such self-incriminating reports. 29 U.S.C. § 439(a). Thus far at least, it would be difficult to state a more literally apt occasion for assertion of the privilege defendant McCarthy invokes.

While it may be neither necessary nor entirely appropriate to go beyond the plain statutory terms for present purposes, the court requested, and counsel obligingly supplied, some possibly relevant items of legislative history. The products of these researches buttress the conclusion that seemed necessary in any event. The bills which became the Landrum-Griffin Act were inspired largely by a long course of Senate Com-

---

3. Before the Landrum-Griffin amendments, § 302(a) had provided, much more briefly, as follows:

"It shall be unlawful for any employer to pay or deliver, or to agree to pay

or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce."

mittee investigation [4] disclosing repeated instances of transactions in which union officials were thought, at best, to have "conflicts of interest," and where, at repeatedly illustrated worst, there were found to be "crooks and racketeers," dubious "middlemen," and subversion by means of "bribery and corruption." [5] A prime concern was perceived to be the union officer exacting or accepting money from management or from people allied with management as an extorted price for labor peace or for "sweetheart contracts"—in short, for the greedy interests of the officer and not for, but against, the interests of those he ostensibly represented. As part of the measures for coping with this, § 302 of the 1947 Labor Management Relations Act was broadened (see note 3, *supra,* and text) to reach an array of intermediaries and devices ("middlemen," "consultants," payments to spouses, etc.) serving essentially to transmit payoffs from management to corrupt labor officers. The statutory arsenal was then strengthened still further by the reporting requirements. These were not confined, strictly and exclusively, to illegal transactions. They extended to the "improper" as well, and even to the merely "questionable." Thus, as the provision for reports was described in S.Rep. No. 187, *supra,* at p. 5, U.S.Code Cong. & Admin. News 1959, p. 2321:

> "The bill is designed to prevent, discourage, and make unprofitable improper conduct on the part of union officials, employers, and their representatives by requiring reporting of arrangements, actions, and interests which are questionable. In some instances, the matters to be reported are not illegal and may not be improper. But only full disclosure will enable the persons whose rights are affected, the public and the Government to determine whether the arrangements or activities are justifiable, ethical, and legal."

Similarly, it was said (*Id.,* p. 15, U.S. Code Cong. & Adm. News 1959, p. 2331):

> " * * * The bill [in reports from union officers] requires only the disclosure of conflicts of interest as defined therein. The other investments of union officials and their other sources of income are left private because they are not matters of public concern. No union officer or employee is obliged to file a report unless he holds a questionable interest in or has engaged in a questionable transaction. The bill is drawn broadly enough, however, to require disclosure of any personal gain which an officer or employee may be securing at the expense of the union members."

Later on, the same report said (p. 38, U.S.Code Cong. & Admin. News 1959, p. 2355) that in recommending the reporting provisions "the committee [was] not to be construed as necessarily condemning the matters to be reported if they are not specifically declared to be improper or made illegal under other provisions of the bill or other laws." But while the things to be reported were not "necessarily" illegal, it was made perfectly clear that proscribed transactions reflecting bribery, conflicts of interest, or, at a minimum, "questionable" dealings were the crux of the matters union officers were to be compelled to tell

---

4. The underlying inquiries and disclosures were those of the Committee on Improper Activities in the Labor and Management Field. Chaired by Senator McClellan, this Committee conducted intensive and well-publicized explorations of activities generally characterized (by the Committee, at any rate, and its numerous sympathizers in and out of Congress) as "labor racketeering." See S.Rep.No.187, 86th Cong., 1st Sess. 2, 4–5, 6, 9, 10, 14, 15, 16, 17, 30, 43–44, 54 (1959); H.R.Rep. No.741, 86th Cong., 1st Sess. 1, 2, 6, 7, 9, 12, 13 (1959), U.S.Code Cong. & Admin. News 1959, p. 2318.

5. S.Rep.No.187, *supra,* at 2, 3, 5, 6, 10, 12, 39, 70; H.R.Rep.No.741, *supra,* at 2, 6, 9, 13. See also, e. g., 105 Cong.Rec. 816 (daily ed. Jan. 20, 1959) (remarks of Senator Kennedy, bill sponsor); 105 Cong.Rec. 5578 (daily ed. April 17, 1959) (remarks of Senator Humphrey, co-sponsor).

about. See, also, *id.*, pp. 5, 9, 12; H.R. Rep.No. 741, *supra*, at 4, 9–10, 26.[6]

■ In short, the Committee Reports serve to emphasize in the most explicit terms what is evident from the text of the statute: that the central object of the reporting provisions was to compel disclosures from which the target officers of unions would face " 'real and appreciable,' and not merely 'imaginary and unsubstantial,' hazards of self-incrimination. Reg. v. Boyes, 1 B. & S. 311, 330; Brown v. Walker, 161 U.S. 591, 599–600 [16 S.Ct. 644, 40 L.Ed. 819]; Rogers v. United States, 340 U.S. 367, 374, [71 S.Ct. 438, 95 L.Ed. 344, 19 A.L.R.2d 378]." Marchetti v. United States, *supra,* 390 U.S. at 48, 88 S.Ct. at 702, 19 L.Ed.2d 889. The reporting requirements, despite their peripheral and inconsequential extension to dealings which *may* be innocent (see below), are aimed with candid deliberateness at "a group 'inherently suspect of criminal activities.' Albertson v. SACB, 382 U.S. 70, 79, [86 S.Ct. 194, 15 L.Ed.2d 165]." *Marchetti, supra,* at 47, 88 S.Ct. at 702. The statutory scheme is not in its essence a broad, relatively neutral, generally "regulatory" system which only incidentally touches those who are suspect and who may not, because of the coincidence, claim a blanket exemption available to no one else. See *id.* at 57, 88 S.Ct. 697; *id.* at 72–74, 88 S.Ct. 697 (Brennan, J., concurring). Rather, the focus is upon activities "questionable" at best, and, much more probably, those plainly "illegal," demanding reports which will normally amount to confessions but will at a minimum serve as evidence tending strongly to incriminate or to supply damaging leads.

The Government argues that the provisions here questioned are not like those in *Marchetti* and its companion cases because there are transactions which are evidently lawful but required to be reported. Thus, in observations that are accurate if not persuasive, the Government notes that reports are required from the union officer:

(1) Where he receives payments or things of value from an employer who *does not* employ members of the officer's union. (For example, defendant McCarthy, an official of a union of electrical workers, would have been expected to report payments from employers of garment workers or fruit pickers—transactions of types the court may be permitted to know are not multitudinous or significant in any pertinent respect.)

(2) Where payments are made by the employer to a spouse or minor child, not to the officer himself. (This could, of course, mean the reporting of innocent things; it is, nevertheless, a rather obvious detection device. It is, in any event, the kind of subject which was for its own sake of no earthly interest to Congress or anyone else).

The short of these "innocent" reporting requirements is that they are of no consequence in terms of the principles applicable to our problem. Such incidental features were undoubtedly included for good, sound, legitimate reasons by the framers of the legislation. *Cf.* Grosso v. United States, 390 U.S. at 68, 88 S.Ct. 709, 714. It does not follow that the courts may "ignore either the characteristics of the activities about which information is sought, or the composition of the group to which the inquiries are made." *Id.* Observing what is patent in the statute, we are compelled to know that the bulk of the matters Congress wanted reported were things the statute simultaneously defined as criminal. If the constitutional consequences of that could be diluted or avoided by tacking on relatively innocuous subjects for reports, the impact of *Marchetti* would be trivial indeed.

There is, at any rate, a more explicitly authoritative answer to this aspect of the Government's position. Under the teachings of *Marchetti, Grosso,* and *Haynes,*

6. The House and Senate Reports discussed provisions essentially identical for our purposes, both with each other and with the statute as it was enacted.

this is not a case where the court is either required or permitted to hold the questioned statutory provision invalid on their face. It is not fatal for the contention of defendant McCarthy that the required reports are not "invariably indicative" of crime, and that relatively "uncommon" situations may be cited and imagined where lawful transactions must be reported. See Haynes v. United States, 390 U.S. at 96–97, 88 S.Ct. 722, 19 L.Ed.2d 923. The crucial point remains that for those like McCarthy, at whom the reporting sections are "directed principally," *id.* at 96, 88 S.Ct. 722 "a proper claim of the constitutional privilege against self-incrimination provides a full defense to prosecutions for failure" to file the prescribed reports. *Id.* at 100, 88 S.Ct. at 732.

Having interposed such a claim, McCarthy may not be further prosecuted under Counts 36 and 37.

■ As has been mentioned, however, the case is different with respect to Count 38. That Count charges, not a "failure" to report, but, in effect, a false report. The defendant, far from failing to report and interposing "a proper claim of * * * privilege," purported to comply with the requirement by filing a report. He waived the privilege. Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 108, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961); Rogers v. United States, 340 U.S. 367, 370–371, 71 S.Ct. 438, 95 L.Ed. 344, 19 A.L.R.2d 378 (1951); Johnson v. United States, 318 U.S. 189, 195–196, 63 S.Ct. 549, 87 L.Ed. 704 (1943); Caminetti v. United States, 242 U.S. 470, 494, 37 S.Ct. 192, 61 L.Ed. 442 (1917).[7] The case in this aspect is like the familiar one of a party who might have claimed

privilege, chose not to, and proceeded to commit perjury. United States v. Winter, 348 F.2d 204, 211 (2d Cir.), cert. denied, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965); Cargill v. United States, 381 F.2d 849, 853 (10th Cir. 1967), cert. denied, 389 U.S. 1041, 88 S.Ct. 781, 19 L.Ed.2d 831 (1968); cf. Dennis v. United States, 384 U.S. 855 864–867, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966).[8]

The motion to dismiss is granted to the extent of dismissing Counts 36 and 37. It is denied as to Count 38. So ordered.

7. Affidavits of both sides establish that McCarthy filed the report involved in Count 38 upon the advice of able counsel who continues to represent him here. It is not necessary to rest upon this, but the factor of such advice serves to dispel any faint trace of conceivable concern over applying the sometimes "technical" doctrine of waiver.

8. It should not be essential, but it cannot hurt, to mention that these observations, addressed to a motion to dismiss, deal with what the indictment *alleges*, not with what the prosecution may or may not succeed in proving.