431 F.2d 421
 UNITED STATES of America, Plaintiff-Appellee,
v.
Roberto CANDANOZA, Defendant-Appellant.
 No. 28730 Summary Calendar.*
*Rule 18, 5th Cir.; See Isbell Enterprises, Inc
v.
Citizens Casualty Co. of New York et al., 5th Cir., 1970,
 
 431 F.2d 409, Part I.
 United States Court of Appeals, Fifth Circuit.
 Sept. 23, 1970.
 Marvin F. Foster, Jr., Corpus Christi, Tex., for appellant.
 Anthony J. P. Farris, U.S. Atty., Houston, Tex., for appellee.
 Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.
 SIMPSON, Circuit Judge:
 
 
 1
 On August 11, 1969, the appellant, Roberto Candanoza, and a co-defendant, Romel Aparicio, were indicted on four counts involving illegal importation of marijuana. The first three counts charged the two defendants with knowingly smuggling, concealing and receiving, and transporting, respectively, fifty-three pounds of non-invoiced marijuana into the United States in violation of Title 21, U.S.C., Section 176a. The fourth and last count charged illegal transfer of marijuana without paying the transfer tax in violation of Title 26, U.S.C., Section 4744(a)(2).
 
 
 2
 All of the events were charged to have occurred on July 11, 1969. The government's evidence tended to show the following: Customs agents on the morning of July 10, 1969, received information that a quantity of smuggled marijuana would be delivered to two unknown persons at what was known as the 'midway river crossing' of the Rio Grande between Roma and Rio Grande City, Texas. About 11:00 p.m. that evening a Ford Econoline pickup truck, bearing 1969 Texas license plate 3K776, was observed to turn off Highway 83 toward the river near the midway crossing. This pickup truck was not known to the agents as being from the area. About 12:00 midnight the Ford pickup was observed to leave the immediate area of the river, proceed to Highway 83 and turn toward Rio Grande City. The truck was followed through Rio Grande City and stopped by customs agents on the eastern edge of that town in front of old Fort Ringgold. The driver was identified as Romel Aparicio and the single passenger riding in the truck cab as Roberto Candanoza. Aparicio had a .38 caliber Colt revolver concealed in his waistband. It was taken from him by the officers. Three cloth sacks lay in the rear of the pickup. Agent Miley asked Aparicio what the sacks contained and he replied 'marijuana', whereupon Agent Kuykendall, in the presence of all the other agents, arrested the two men and gave them full Miranda-type warnings. Attempts to secure the cooperation of the two men at this time were unsuccessful. The two defendants, the pickup truck and the contraband were taken to the United States Border Patrol Office in Rio Grande City, Texas, where personal history data was taken by the officers. Agent Villarreal attempted to question Candanoza but the appellant refused to state his place of residence and refused to answer any questions concerning the marijuana. The agent made demand on him for production of the order form required by the Secretary of the Treasury for the transfer of marijuana but he had no such form in his possession. Aparicio also refused to answer any questions concerning the marijuana, and as to the vehicle stated only that it was not his. Production of the Treasury order form for the transfer of marijuana was demanded of him and he replied that he had no such form. The two men were then taken to Edinburg, Texas, and jailed to await a commissioner's hearing.
 
 
 3
 At the trial, after denial of Candanoza's motion for judgment of acquittal, he offered the testimony of his co-defendant Aparicio who had pled guilty, as set forth above. The general trend of Aparicio's testimony was an attempt to exculpate Candanoza. His testimony included the following statements:
 
 
 4
 'A. * * * well I smoke marijuana every once in a while * * * And I figure I was going to buy some marijuana for myself and take it to Michigan * * *
 
 
 5
 'A. And before I left my house Robert (Candanoza) here called me and told me he was in town * * *
 
 
 6
 'A. Well, right before we got into Rio Grande City * * * I told him I was going to go pick up some marijuana but I didn't tell him how much or anything like that because I didn't know myself, you know. I was just going to buy some. And when I told him that, he just went along with me * * *'
 
 
 7
 'THE COURT: He didn't get out of the car and say I'm not going with you?'
 
 
 8
 'A. No sir. And this other guy Juan told me then that the only way-- the only marijuana I could get was if they would pay me $150.00 if I would transport some-- if I would take it in my truck from Rio Grande City to Pharr.
 
 
 9
 'Q. Now did Robert know anything about your supposed to deliver this to a red car at the Catholic church and get $150?
 
 
 10
 'A. Well, after we got there and we talked, well, Robert was with me but Robert was not going to get any out of there unless I gave him some or something * * * from the $150 they were going to give me.
 
 
 11
 'THE COURT: Were you still in the car when Juan told you the story about they going to offer you some money to carry some marijuana back to Pharr?
 
 
 12
 'A. Yes, we still--
 
 
 13
 'THE COURT: Robert was there listening to the conversation?
 
 
 14
 'A. Yes, sir.'
 
 
 15
 Aparicio's statement in general indicated that he was attempting to obtain an unspecified (presumably small) quantity of marijuana, for his own use, using money which had been sent to him by a friend in Michigan. He stated that he had been referred to a man in Pharr, Texas, named Juan, who told him to come back the evening of July 9 and accompany him to Rio Grande City where a quantity of marijuana was to be acquired. Aparicio and Juan made one trip to Rio Grande City in vain since the courier did not put in his appearance. The following night another attempt was made. In the meantime, according to Aparicio, he had received a telephone call from 'Robert' (the appellant) and invited the appellant to accompany him to Pharr. The three of them, Aparicio, Juan and Robert went from Pharr to Rio Grande City where they met one 'Guero' and arrangements were made for Aparicio to pick up the smuggled marijuana at a location by the river and carry it to a man waiting in a red automobile near the Catholic Church in Pharr. Aparicio testified that the appellant was present while these arrangements were made. Aparicio claimed that he was to receive $150.00 for his services and was possibly to be permitted to purchase some of the marijuana. The party traveled west with Guero driving his own car to a point seven or eight miles from Rio Grande City where they turned off the highway toward the river. Guero and Juan went down to the river and returned with the marijuana. The party was captured while returning from this expedition, the appellant Candanoza being in the same vehicle with Aparicio. The appellant offered no further evidence and renewed his motion for judgment of acquittal.
 
 
 16
 Appellant pled not guilty and was tried alone[1] by a jury which returned a guilty verdict on the first three counts under Section 176a. The fourth count under Section 4744(a)(2) was dismissed by the court pursuant to appellant's motion as being in violation of appellant's privilege against compulsory self-incrimination. See Leary (footnote 1), supra. The district court sentenced appellant to five years confinement under each count to be served concurrently and this appeal followed.
 
 
 17
 Two principal grounds for reversal are urged: (a) the invoicing procedures required by Section 176a are violative of appellant's Fifth Amendment privilege against compulsory self-incrimination, and (b) there was insufficient or no evidence to prove non-compliance with the invoicing procedures, knowledge of illegal importation, and possession, i.e. dominion and control over the marijuana. We find both contentions to be without merit and affirm the judgment below.
 
 
 18
 Before trial, appellant filed a motion to dismiss Counts I, II and III, under Section 176a on the grounds that the statute violated appellant's Fifth Amendment privilege against compulsory self-incrimination. This motion was overruled thereby preserving for decision on this appeal the question of whether or not appellant's compliance with Section 176a, i.e. declaration and invoicing of contraband before importation, renders appellant vulnerable to federal or state prosecution.
 
 
 19
 This precise issue was before this Court in Walden v. United States, 5 Cir. 1970, 417 F.2d 698.[2] Our holding was that the declaration and invoicing requirement of Section 176a did not violate the privilege against compulsory self-incrimination under the Grosso and Marchetti doctrine.[3] The Walden court, on page 700 of 417 F.2d, said:
 
 
 20
 'In Grosso and Marchetti, the defendants were convicted of failing to pay taxes to the United States on activities which the States had declared to be illegal. The United States made its tax records available to the states. Therefore compliance with the Federal wagering tax statutes meant incrimination at the State level. But compliance with 21 U.S.C. 176a precipitates no such incrimination. Had Walden declared and invoiced the marihuana at the border, it would have been immediately seized by Customs. At that point Walden would not have been vulnerable to prosecution, either Federal or State, because he would have complied with the Federal law and he would have never reached the State of Texas with marihuana in his possession. As it was, he violated 21 U.S.C. 176a, became vulnerable to prosecution by the United States and, he alleges, the State of Texas. We laid to rest the contention that 21 U.S.C. 176a was violative of the privilege against compulsory self-incrimination when we said: It would be strange indeed if one could Constitutionally be required to declare ordinary merchandise at the border and be punished for failure so to do, if, at the same time, surreptitious importation of contraband does not have to be declared and a failure to declare cannot be punished. The importation is not compelled and the Fifth Amendment privilege against compulsory self-incrimination does not apply. Rule v. United States, 5 Cir. 1966, 362 F.2d 215, 217.'
 
 
 21
 We agree with the government that Walden controls this case and that if appellant had complied with the declaration and invoicing requirements of Section 176a before importation he would have violated neither federal nor state law. This is so because he would have complied fully with the federal law and would never have reached the State of Texas with marijuana in his possession. Likewise, we find appellant's heavy reliance on Leary (footnote 1) supra, to be misplaced. See Walden, supra, 417 F.2d at p. 700; United States v. Hudson et al., 5 Cir. 1970, 431 F.2d 468.
 
 
 22
 Careful review of the record convinces us that appellant's second contention as to the insufficiency of the evidence is without merit.[4] Without reliance on any Leary-type presumption there was sufficient evidence from which a jury could reasonably find noncompliance with prescribed invoicing procedures, knowledge of illegal importation and possession of (dominion and control over) the imported marijuana. The jury heard evidence from government witnesses and appellant's co-defendant Aparicio which strongly indicated that appellant was fully aware of the purpose of his ride with Aparicio to a dark and secluded spot, the midway river crossing on the Rio Grande about eight miles west of Rio Grande City, Texas. That purpose, the jury was warranted in finding Candanoza knew, was to receive, conceal, and transport marijuana illegally into the United States. In addition, importation of marijuana requires invoicing, and knowledge of unlawful entry implies knowledge that the marijuana had not been invoiced. Further, the record indicates that appellant rode in the truck in which the illegally imported marijuana was transported, without ever attempting to disassociate himself from the smuggling venture. Constructive possession was a reasonable and permissive inference.
 
 
 23
 Affirmed.
 
 
 
 [1]
 Co-defendant Aparicio did not stand trial. The government dropped the first three counts against him after he voluntarily waived his defense against compulsory self-incrimination under Count IV, the Section 4744(a)(a) count. See Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969). A seven-year sentence of imprisonment was imposed, but Aparicio was required to serve only sixty days leaving six years and ten months which was suspended. He was placed on five years probation contingent on good behavior with respect to the unserved portion. See Title 18 U.S.C., Sec. 3651, the 'split sentence' statute
 
 
 [2]
 See also: Yohey v. United States, 5 Cir. 1970, 429 F.2d 1279; Medina v. United States, 5 Cir. 1970, 427 F.2d 525; United States v. Brooks, 5 Cir. 1969, 416 F.2d 459
 
 
 [3]
 See Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) and Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968)
 
 
 [4]
 At the close of all the evidence, appellant renewed his motion for judgment of acquittal and thus preserved the question of the sufficiency of the evidence. Harris v. United States, 5 Cir.1960, 285 F.2d 85, 86; T'Kach v. United States, 5 Cir. 1957, 242 F.2d 937