Pablo **ELIZARRARAZ**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 24328.

United States Court of Appeals Fifth Circuit.

Sept. 3, 1968.

Godbold, Circuit Judge, dissented.

Jack C. Eisenberg, Austin, Tex., for appellant.

Reese L. Harrison, Jr., Asst. U. S. Atty., San Antonio, Tex., for appellee.

Before BELL, COLEMAN and GODBOLD, Circuit Judges.

COLEMAN, Circuit Judge:

Appellant, Pablo Elizarraraz, stands convicted in the District Court at Austin of knowingly failing, neglecting, and refusing to perform a duty required of him under the provisions of the Universal Military Training and Service Act, in violation of Title 50 United States Code §§ 456(j) and 462(a).[1] We affirm.

Elizarraraz was born January 13, 1941 in George West, Texas. In 1956 he became a member of the religious sect known as Jehovah's Witnesses. He has formal education through the eighth grade. On January 15, 1959, he registered with his local draft board. On the following August 11, he was classified 1–0, conscientious objector. Over four years later, on October 7, 1963, he submitted to the Armed Forces physical examination and was found to be acceptable for military service. On December 13, 1963, while he was living in Corpus Christi, the draft board, in writing, submitted to the registrant three types of civilian work at the Texas State Hospital at Austin deemed appropriate in lieu of military induction.

In response thereto the draft board received a letter from Elizarraraz, as follows:

"I appreciate the offer that was offered to me to perform a type of civilian work at the State Hospital. My religion and my conscience does not permit me to perform any type of civilian work. I do respect my country and what it stands for, but I still have to stay within God's laws. Your truly, Pablo Elizarraraz."

This written refusal to work in lieu of induction stood up for nearly two years, until May 13, 1965. Elizarraraz was then duly directed to report to the Texas State Hospital at Austin to do hospital work.[2] He reported as directed, but

---

1. The Grand Jury Charges:

That on or about June 2, 1965, PABLO ELIZARRARAZ was a male person subject to service under the Universal Military Training and Service Act, as amended, who had duly registered under said Act with Texas Local Board No. 16, San Benito, Texas, and had been classified as a conscientious objector (I–0), and had been notified of said classification; and that on or about May 28, 1965, the said PABLO ELIZARRARAZ was duly ordered by Texas Local Board No. 16, San Benito, Texas, to report to said local board where he would receive instructions to proceed to the Austin State Hospital, Austin, Texas, within the Austin Division of the Western District of Texas, to perform civilian work contributing to the maintenance of the national health, safety and interest, and the said PABLO ELIZARRARAZ was further ordered to

report for employment at the Austin State Hospital and to remain in employment there for twenty-four (24) consecutive months or until such time as he was released or transferred by proper authority, and the said PABLO ELIZARRARAZ did knowingly fail, neglect and refuse to perform a duty required of him under the provisions of said Act in that he knowingly failed, neglected and refused (1) to accept the employment available at the Austin State Hospital, and (2) to remain in said employment for a period of twenty-four (24) consecutive months or for any period whatsoever, pursuant to the order of the local board; in violation of Title 50, United States Code Appendix, Sections 456(j) and 462(a).

2. We do not burden this opinion with a recitation of all the administrative actions, letters, notices, and orders of the

upon arrival he refused to sign an employment form required of all individuals who go to work at that institution. He then left the hospital without entering upon, doing, or performing any work. Indictment, conviction, and sentence followed.

Mr. Elizarraraz testified in his own defense. Among other things he stated:

"I met this lady, that I identified myself to her, and she said that she was already waiting for me, and that she had already had a notice from the Draft Board, and she gave me an application and told me to walk out in the hall and fill it out, *and so I told her that I had already explained it to my Draft Board in San Benito, my reason for not filling out the application,* [emphasis supplied] and that they still directed me here to Austin, and told me to talk to that lady, or whoever it was over here."

This testimony was followed by these questions and answers:

"Q. Did the order tell you to go to work at the Austin State Hospital?

A. Yes, sir.

Q. Were you at that time, and are you now willing to work at the Austin State Hospital?

A. Yes, sir.

Q. All right. Would you explain why it is to the jury and His Honor, please, that you cannot in your conscience fill out the application?

A. Well, the main thing is that I couldn't compromise myself on doing a job that would be—well, keeping me from my religious services, and at the same time— well, sometimes by violating God's principles, that, I mean, I would believe, honestly believe it was a violation of God's law.

Q. All right, sir. If you could go out to the Austin State Hospital and go to work without filling out the application, would you be willing to do so?

A. Yes, sir, I would.

Q. Would you do it today?

A. Yes, sir, I would.

\*    \*    \*    \*    \*    \*

Q. Mr. Elizarraraz, before you left for Austin you told the local Draft Board that you would not fill out any application; is that right?

A. Yes, sir, and I—

Q. You also told the local Draft Board in that letter that is on page 37 [of the exhibits in evidence] that your religion and conscience does not permit you to perform any type of civilian work; is that correct?

A. Yes, sir.

Q. You didn't say anything in that letter about an application, though, did you?

A. No, sir, I didn't.

Q. All right. And you stated that to sign the order would mean that you would be agreeing to compromise your position, to sign the application.

A. I believe so, yes, sir.

Q. You said that to Mr. Eisenberg just now, did you not?

A. Yes, sir.

Q. And you have also stated that it is a violation of God's law to fill out the application form; is that right?

A. No, sir, not the application itself, no, sir.

Q. All right. Is it a violation of God's law for you to perform work that you are ordered to do

Local Board in this case. We have carefully examined the record and find that

the Regulations were scrupulously complied with.

by the United States Government, or any Government?

A. It depends upon the work, yes, sir, I would say.

Q. Well, is this civilian work at the Austin State Hospital, is it a violation of your creed to perform that work when ordered to do so by the United States?

A. That particular job, you mean?

Q. Yes, sir.

A. No, sir, I don't think so.

Q. What would you do if they told you you had to work on Sunday? Would—let's say you are out there, and you haven't signed any application, and they told you that, "Today you are going to have to work on Sunday;" what would you do?

A. Well, that would—I would have to tell them *my conditions* [emphasis supplied] and I had those meetings I had to attend."

With particular reference to a meeting with the Draft Board on February 27, 1964, the appellant testified as follows:

"Q. And you were informed of your rights and the purpose of the meeting, were you not?

A. Yes, sir.

Q. And you at that time stated you refused to agree on any type of work you would be willing to perform in lieu of induction, as you felt it would be in direct conflict with your religious work?

A. Yes, sir.

Q. You told them that, didn't you?

A. Yes, sir.

Elizarraraz contends on appeal that the Government failed to meet its burden of showing beyond a reasonable doubt that he knowingly failed, neglected, and refused to report to the Austin State Hospital and to perform two years of civilian work in lieu of military service. At the heart of the matter, he urges that he did not fail or neglect or refuse to work *but that he only refused to fill in the application form presented to him when he appeared at the Hospital* and that such refusal cannot constitute a violation of the statute. We find this contention to be without merit. The appellant freely admitted that he knew before he went to Austin that he would be expected to fill in a job application and that before he left San Benito he told his Draft Board that he would not fill in such an application. He admitted that there was nothing in the application form which violated "his duty to God", even if that had been a justifiable excuse for not filling it in and signing it, cf. United States v. Kime, 7 Cir., 1951, 188 F.2d 677, cert. den., 342 U.S. 823, 72 S.Ct. 41, 96 L.Ed. 622. The decisive factor of the case is that when the registrant was first offered civilian work in lieu of induction he categorically stated that "My religion and my conscience does not permit me to perform any type of civilian work". Prior to trial, he ever afterward adhered to that attitude. We entertain no doubt that the requirement to do civilian work must, of necessity, carry with it the performance of any and all acts, such as appropriate record keeping, reasonably incident to that status.

It is most impressive that although the appellant was ably and energetically represented by appointed counsel at his trial below and on this appeal, the "application form", whatever its contents, was apparently considered to be so devoid of any legal significance that it was not offered in evidence at the trial in the District Court. Therefore, it is not a part of the record here.

From the evidence in this record it was clearly within the province of the jury to believe beyond a reasonable doubt that Elizarraraz's refusal to fill in the form was simply a pretext in furtherance of his previously declared resolution not to do the civilian work required by law. Actually, so far as we know or can tell,

the "application form" was, in fact, not a request for work, if we strip the matter of semantics. It was not within the contemplation of the parties that he was applying for a job; he was being assigned to a job. Everybody so understood it, including the balky assignee.

It is true that Elizarraraz at the trial testified that he would be willing to work at the hospital if he did not have to fill in and sign the application form, but this assurance was limited by his further testimony that if he began work without filing such an application he would feel free, at his personal discretion, to prescribe the conditions upon which he would perform assignments.

The requirement to do civilian work in lieu of military induction cannot be frittered away by such defenses as those raised on this appeal.

It is next contended that the District Court committed reversible error when it overruled an objection to the following argument of the prosecutor in his summation to the jury:

"* * * Our country has gone to war now in two World Wars, as they are called, engaged right now in a conflict that in some instances staggers the imagination as to the number of men involved, the number of men that are giving their lives each day. The Government in this case regarding Pablo Elizarraraz has not asked him to place his life in jeopardy, has not asked him to go to boot camp, to shine his shoes, to drill, to march—"

The objection to this argument was couched in this language:

"Your Honor, I want to object to this line of argument. There is no question, this man is entitled to his Constitutional protection as a conscientious objector. Any argument to the effect of what he—what the Constitution affords him and what the statutes afford him is not the question in this case. It is whether or not he failed, refused and neglected to report to the Austin State Hospital out here."

■ In the first place, there is no constitutional right to exemption from compulsory civilian duty in lieu of military service, Wood v. United States, 5 Cir., 1967, 373 F.2d 894. Appellant did not complain to the trial judge that the argument was prejudicial or that it was calculated to inflame the jury. He did not move for a mistrial.

■ We therefore must consider this specification under the plain error rule. We hold that the argument, under all the facts and circumstances of this case, did not constitute reversible error. It contained no opprobrious denunciation of Elizarraraz. It simply alluded to that which is common knowledge—contrasting that which the registrant could lawfully have been compelled to do had it not been for the grace extended by Congress to those who conscientiously object to military service.

■ One of the judges is of the view that the conviction ought to be reversed because, it is said, the application contained an unconstitutional loyalty oath. The majority is unwilling to consider this question because the accused form is not in the record and the objection was never raised below or in the briefs or oral arguments here. This issue, if there be one, should first be considered, if the appellant wishes to pursue it, in appropriate proceedings instituted under 28 U.S.C., section 2255.

It might be further noted that if this appellant is genuinely willing to perform the duty required of him by law he still has an opportunity to convince the District Judge of that fact pursuant to a motion filed under Rule 35, Federal Rules of Criminal Procedure.

Affirmed.

GODBOLD, Circuit Judge (dissenting):

I dissent. Appellant's conviction should be reversed.

The local board order directing appellant to report to the Austin State Hospital for civilian employment in lieu of military service is quoted in the margin.[1] The charge against appellant is that he knowingly failed, neglected and refused "(1) to *accept the employment available* at the Austin State Hospital, and (2) to remain in said employment for a period of twenty-four consecutive months or for any period whatsoever," pursuant to the order of the local board.

1. "Having been found to be acceptable for civilian work contributing to the maintenance of the national health, safety, or interest you have been assigned to Hospital Work located at The Austin State Hospital, Austin, Texas.

"You are ordered to report to the local board named above at 11:00 a.m. on the 28th day of May 1965, where you will be given instructions to proceed to the place of employment.

"You are ordered to report for employment pursuant to the instructions of the local board, to remain in employment for twenty-four (24) consecutive months or until such time as you are released or transferred by proper authority.

"You will be instructed as to your duties at the place of employment.

"Failure to report at the hour and on the day named in this order, or to proceed to the place of employment pursuant to instructions, or to remain in this employment the specified time will constitute a violation of the Universal Military Training and Service Act, as amended, which is punishable by fine or imprisonment or both."

2. ART. 6252–7. "LOYALTY OATHS
"Oath of persons receiving salary or compensation
"Section 1. No funds of the State of Texas shall be paid to any person as salary or as other compensation for personal services unless and until such person has filed with the payroll clerk, or other officer by whom such salary or compensation is certified for payment, an oath or affirmation stating:

" '1. That the affiant is not, and has never been, a member of the Communist Party. (The term "Communist Party" as used herein means any organization which (a) is substantially directed, dominated or controlled by the Union of Soviet Socialistic Republics, or its satellites, or which (b) seeks to overthrow the Government of the United States, or of any State, by force, vio-

## I

The appellant did not fail, refuse or neglect "to accept the employment available" at the hospital. There was no employment available to him except upon a condition that the hospital could not constitutionally impose upon him. The employment application which appellant declined to sign contained an invalid loyalty oath. See Tex.Rev.Civ.Stat.Ann. art. 6252–7 (Vernon ed. 1962), pertinent parts of which are set out in the margin.[2]

lence or any other unlawful means); and

" '2. That the affiant is not, and, during the preceding five year period, has not been, a member of any organization, association, movement, group or combination which the Attorney General of the United States, acting pursuant to Executive Order No. 9835, March 21, 1947, 12 Federal Register 1935, has designated as totalitarian, fascist, communist or subversive, or as having adopted a policy of advocating or approving the commission of acts of force or violence to deny others their rights under the Constitution of the United States, or as seeking to alter the form of Government of the United States by unconstitutional means; or, in the event that the affiant has during such five year period been a member of any such organization, association, movement, group or combination, he shall state its name, shall state in detail the circumstances which led him to join it, and shall state that, at the time when he joined and throughout the period during which he was a member, he did not know that its purposes were the purposes which the Attorney General of the United States has designated; and

" '3. That the affiant is not, and, during the preceding five year period, has not been, a member of any "Communist Political Organization" or "Communist Front Organization" registered under the Federal Internal Security Act of 1950 (50 U.S.C.A., sec. 781, et seq.) or required to so register under said Act by final order of the Federal Subversive Activities Control Board; or, in the event that the affiant has during such five year period been a member of any such organization, he shall state its name, shall state in detail the circumstances which led him to join it, and shall state that, at the time when he joined it and throughout the period during which he was a member, he did

The application form was not introduced into evidence. However, by motion to dismiss the appellant raised the point that to comply with the board's order he would be required to answer questions which he could not be required to answer, and in oral argument of the motion the questions were identified as relating to membership in the Communist or Fascist Party or front organizations. On oral argument before us counsel acknowledge the presence of the loyalty oath in the application.

Section 1 of article 6252–7 was held unconstitutional on August 30, 1967, by a three-judge district court in Gilmore v. James, 274 F.Supp. 75 (N.D.Tex.1967), aff'd per curiam, 389 U.S. 572, 88 S.Ct. 695, 19 L.Ed.2d 783 (1968).

Appellant's conviction stands or falls on his refusal to sign the application form and the refusal of the state to employ him unless he did so.[3] He did not refuse employment but declined to perform the condition attached by the state to its willingness to take him into its employ. There did not purport to be (in fact there could not validly be) a board order directing appellant to sign the form.[4]

Appellant's conviction is not made valid by the fact that the evidence does not show that he was motivated by or even knew of the presence of the oath in the application. The causes which did motivate him are discussed below. The American citizen is ofttimes the unwitting beneficiary of judicial decisions articulating constitutional principles of which he was unaware at the time he performed an act characterized as criminal or the source of alleged civil liability. This Circuit has summarily disposed of a host of cases controlled by Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) and Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968).[5] In so doing

---

not know that its purpose was to further the goals of the Communist Party or that it was controlled by the Communist Party."

"Lists of subversive organizations

"Sec. 2. The Department of Public Safety shall obtain a list of the organizations, associations, movements, groups and combinations comprehended by Subdivisions 2 and 3 of Section 1 hereof, and shall furnish a copy of such list to the various agencies which expend funds of this State. Such agencies shall make copies of such list and shall furnish them to their employees in order that the employees can readily perceive whether they can lawfully and truthfully file the oath or affirmation required herein."

Texas has pervasive Communist control laws which *inter alia* required that Communists and members of Communist front organizations register and furnish a multiplicity of information, and barred the names of Communists from appearing on the ballot. Tex.Rev.Civ.Stat. Ann. art. 6889–3 & 6889–3A (1960). Vernon's Texas Stat.Ann. One of the provisions is that no person may hold a nonelective job for the state if the remuneration is paid in whole or part by state funds where reasonable grounds exist for the employer of the person to believe that he is a Communist or a knowing member of a Communist front organization. Art. 6889–3, § 7.

3. The alternative allegation of refusal to remain in employment is not supported by evidence. It is undisputed that the employment did not commence. There was testimony of appellant's concern over whether he would have to work on Sundays, but even if proved that he had a mental reservation or self-imposed condition as to duties he would perform if employed, he could not be convicted for an anticipatory violation which might never occur.

4. When the registrant is ordered to report to civilian employment the process of selecting him for service is at an end and he has received a final order. Daniels v. United States, 372 F.2d 407 (9th Cir. 1967). The Texas state form is not a board form and appellant cannot be convicted as though he refused to sign a required board form.

5. See, e. g., Upshaw v. United States, 399 F.2d 149 (5th Cir. 1968) ; Lee v. United States, 398 F.2d 834 (5th Cir. 1968) ; Scaglione v. United States, 396 F.2d 219 (5th Cir. 1968) ; Vouras v. United States, 393 F.2d 936 (5th Cir. 1968) ; Boehm v. United States, 392 F.2d 978 (5th Cir. 1968) ; Leonard v. United States, 392 F.

we have not at the appellate level concerned ourselves with the motivation impelling each defendant to wilfully fail to pay the excise tax on wagering, 26 U.S.C.A. § 4401, or the occupational tax, 26 U.S.C.A. § 4411. One can fairly assume that few, if any, of these defendants refused or failed to pay the tax because of motivation that execution of the return required to accompany payment was a violation of the Fifth Amendment. But in any event we have not paused to inquire into motivation, recognizing instead that all these defendants are entitled to the benefit of the constitutional principles articulated with respect to execution of the returns which, for whatever reasons, they would not sign. No case has been remanded for further trial, and possible conviction if it could be proved that when the defendant refused to sign the return his state of mind was not directed to the constitution.

Allowing this conviction to stand would be an erosion of the principle that waiver of constitutional protections must be made knowingly and intelligently. Elizarraraz did not knowingly and intelligently waive—he neither knew nor could predict the law, and insofar as the record shows, he was unaware of the presence of the loyalty oath.

The examples are numerous. The right of an accused to counsel—pretrial, trial and appellate—is not lost by his not knowing of the right or not insisting upon it. In Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Supreme Court analyzed the general state of the law to determine whether the average lawyer (or particular attorneys engaged in the earlier New York Times litigation) was possessed of sufficient knowledge and prescience that failure to assert constitutional objections before and at trial

amounted to a knowing waiver. The Court concluded there was no waiver. Elizarraraz did not take a lawyer along when he reported to the hospital. There cannot be exacted of this defendant a higher standard to know and to assert the constitutional bases for his actions than was required of the distinguished attorneys in *Curtis*.

## II

Without regard to presence of the loyalty oath, appellant was justified in refusing to sign a document characterized to him as an application for employment. He could not refuse to give relevant employment data, verbally or in writing, such as that relating to job placement (former employment, skills, training, etc.) or that necessary to maintain proper employment records (home address, next of kin, Social Security number, etc.). But for the conscientious objector the difference between supplying necessary data and affirmatively requesting employment to which he is ordered in lieu of military service is as wide and deep as the Grand Canyon.[6]

Stripped to the nerve, what happened in this case could not be plainer. And it is no less plain because couched in the halting language of a man with an eighth-grade education, seeking to articulate to administrative agencies, and then to courts and judges, the call of his conscience and his religion. Elizarraraz was not engaged in frivolous pretext. His refusal to sign an application for employment was justifiable. He *would* report for work, and did so. He *would* commence work, so long as he was acting pursuant to orders of the board. He *would not* by act and writing *affirmatively request* the employment that he was willing to accept under compulsion. He would work but he would not apply

2d 586 (5th Cir. 1968); Motley v. United States, 392 F.2d 590 (5th Cir. 1968); Sklaroff v. United States, 389 F.2d 1004 (5th Cir. 1968).

6. We do not know what the application form contained other than the loyalty

oath. But we must take it as characterized and describe to appellant, as the application for employment required of all persons seeking employment at the hospital. From the statutes we know it had to be in affidavit form.

for work.[7] Repeatedly in his testimony appellant referred to his position that he could not *agree to compromise himself*.

The majority view the application as reasonably incident to appellant's embarking on his duties. When stripped of the statutorily-required loyalty oath the requirement of an executed application loses its viability, for the same function can be performed by securing data from the registrant. Reception of conscientious objectors reporting to Austin State Hospital for employment is nothing new to the hospital, as the record in this case and prior decisions of this court show. Requiring the registrant, who is under orders to report to work, to request the job, as opposed to securing data, makes no sense except as a means for carrying out the invalid legislative command. The hospital could get as much information from a data sheet or an interview as from a request for employment. If the hospital gains some advantage in employer-employee relations by being able to say to its conscientious objector employees "You asked for the job," this is a benefit it may not exact of them.

No one should understand better than prosecutors and judges the difference between acting by command and by consent. The Supreme Court recognized it in the flag salute case, West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). The affirmative act of asking in writing, just as the salute to the flag, "requires the individual to communicate by word and sign his acceptance of the political ideas it thus bespeaks. Objection to this form of communication when coerced is an old one, well known to the framers of the Bill of Rights." 319 U.S. at 633, 63 S.Ct. at 1183, 87 L.Ed. at 1635. "To sustain the compulsory flag salute we are required to say that [the] Bill of Rights * * * left it open to public authorities to compel him to utter what is not in his mind." Id. at 634, 63 S.Ct. at 1183, 87 L.Ed. at 1635.

Others have recognized the distinction between obedience to the power of the sovereign and affirmation. Thomas Becket, Archbishop of Canterbury, would affirmatively recognize the authority of Henry II and of the concordat at Clarendon but with the qualification "saving the honor of the Church and my order." Green, A Short History of the English People, 134–35 (1877). Sir Thomas More would die at the block not for unwillingness to recognize the power of the sovereign Henry VIII but for refusal to take the oath required of every person of legal age in England swearing allegiance to the Act of Succession. 2 Churchill, A History of the English Speaking Peoples 64–65 (1955). The mythological William Tell shot the apple from his son's head for refusal to salute the bailiff's hat.[8]

There is no constitutional right to exemption from military service or to status as conscientious objector. The United States may *order* the citizen to military service, or to the statutory substitute of acceptable civilian employment in lieu thereof, without violation of First Amendment rights. But it cannot without violation of those rights, *order him to consent, assent or ask for* either military service or the civilian job in lieu thereof. The conscientious objector can be required to obey notwithstanding his religious principles. But his First

---

7. The state would not accept him unless and until he did apply. Had the clerk who dealt with appellant at the hospital sought to elicit from him, verbally or in writing, relevant and necessary data, without insistence that he affirmatively act to request employment, this case might never have arisen. At the time, and even at the trial, the insistence was unexplained. But the reason now is clear. Without the executed loyalty oath appellant could not be put on the payroll.

The hospital's position is clear from the letter report it sent to the board: "This is to advise that the above-named person reported to make application at this institution, but refused to fill the application out."

8. See 21 Encyclopedia Britannica, 1963, ed. p. 914, and footnote 13, West Virginia Board of Education v. Barnette, supra.

Amendment rights may not be overridden by requiring that he communicate by word or sign that he seeks what he can be compelled to perform.

The statute and the regulations respond to the limits imposed by the Constitution. The statute does not require that the conscientious objector request civilian work, but that he may be ordered by the board to perform such civilian work as the board deems appropriate. 50 U.S.C.A. App. § 456(j). The regulations, while encouraging cooperation and assent, maintain a continuing distinction between consent and command. The registrant shall submit three types of civilian work he is qualified to do and offers to perform. 32 C.F.R. § 1660.20(a). He is not required to offer to perform any kind of work. This procedure is to give him an "opportunity to avail himself of a free choice of a place of employment." United States v. Simpson, 135 F.Supp. 802, 804 (N.D.Cal.1955). If he ails to submit types of work which he offers to perform, or if the local board finds none of the offered work appropriate, the board notifies him of three types of work it deems appropriate. The registrant files a statement with the board that he offers, or does not offer to perform any of the suggested types of work. 32 C.F.R. § 1660.20(b).

If the registrant and the board are unable to agree on a type of civilian work to be performed, the State Director of Selective Service or his representative must meet with registrant and board and offer his assistance in reaching an agreement. 32 C.F.R. § 1660.20(c).

If after the meeting the board and registrant are still unable to agree the board orders him to report for work it deems appropriate. 32 C.F.R. § 1660.20 (d). Throughout the process at the board level the registrant may act voluntarily, and if he does not the procedure moves to the next prescribed step, until the ultimate and inevitable subjection to board command. It is entirely inconsistent with the recognition throughout of the registrant's right to give or withhold his volition that after the board command issues he may be in violation of the statute for declining to make the offer to perform that at all prior stages he has been allowed but never required to make. The term "conscientious objector" carries within it the concepts of conscience and a congressionally-recognized privilege of objecting, with concomitant powers to command the objector, and excludes concepts stultifying in any degree recognition of the right of the human spirit to say "I will obey but I do object." The distinction is no less applicable to the registrant ordered to military service. He must report as ordered, must take the step forward at the induction center, and must give relevant data. But no inductee is, or constitutionally may be, required to fill out and sign a form requesting induction. The exigencies of military life, or even of civilian employment at the hospital, may require the serving of non-kosher food to the orthodox Jew. But he cannot be forced to sign a request for such a diet.

This case represents a greater infringement on the Bill of Rights than the *Barnette* case. *Barnette* did not turn upon possession by the school children of particular religious views but upon whether there was power vel non to make the flag salute a legal duty of any citizen regardless of his religious views, 319 U.S. at 634–635, 63 S.Ct. 1178, 87 L.Ed. at 1635–1636. Elizarraraz is sought to be required to request employment in spite of his particular religious views. Also the request is required of him in a context where his presence at the scene and participation as an actor in the events is by reason of a Congressional policy of allowing him status as a conscientious objector because of his particular religious views.

### III

The majority say the refusal to sign the form is not determinative but merely an element of and in furtherance of an earlier statement by appellant that his religion and his conscience would not permit him to do civilian work. Appellant is charged with refusing to accept described employment. He is not

charged with being contumacious or uncooperative or with making statements evidencing an unacceptable state of mind. The only significance of appellant's state of mind before he went to the hospital, or at the hospital, is in determining whether he knowingly failed or refused to accept the described and available employment. His state of mind could not make the employment available as charged in the indictment, and employment was not available unless appellant would do something he could not constitutionally be compelled to do.

Nevertheless let us look at appellant's state of mind.

The decisive factor in the case is said to be a letter written approximately 18 months before appellant was ordered to, and did, report to the hospital, and is described as a categorical position ever afterwards adhered to. It was written in response to the suggestion by the board of three types of civilian work, a submission the board is required to make by 32 C.F.R. § 1660.20(b). The board's letter appropriately called for appellant to state whether he did offer or did not offer to perform any of the suggested types of work. Appellant refused, but he said too much. The reference to "any type of civilian employment" was not *ever* afterwards adhered to. It was *never*

afterwards adhered to. Subsequent events make perfectly clear that if appellant ever intended his letter as a refusal of all civilian work that intent did not last long. The meeting required by § 1660.20 was held in February 1964, and appellant attended. The report thereof shows not that he refused any civilian work but refused to agree on any *type* of civilian work. This he is free to do. The board concluded hospital work at Austin State Hospital was appropriate. Thirteen months later a vacancy occurred at the hospital.[9] The hospital told the board when appellant was to report, and the board order was issued. Elizarraraz reported to the board as directed. He received his instructions, boarded the bus with his suitcase and work clothes and a one-way ticket and reported as and when ordered.

The emphasis on the letter, and the denigration of appellant's position taken throughout the administrative stages, a position he is allowed by the regulations to take, are an implicit approach that the conviction must stand not because he refused available employment as charged but because his motivations and his unwillingness to volunteer during administrative stages are viewed as unacceptable. He is to stand convicted for his state of mind and not for doing the act with which he is charged.[10]

9. In the interim appellant lost his classification card and duly reported it. Also he was sent a current information questionnaire and promptly completed and returned it.

10. Comments of government counsel at the trial so denigrated appellant's authorized and voluntary actions that, though not objected to, they justify reversal as plain error. Appellant denied having received a voluntary form which the government contended he had not returned. In arguing the relevance of a board record offered to show that he had been sent the form and had not returned it, government counsel said:

"Your Honor, it is up to the jury to decide whether or not he did receive the form, based upon what is in the file, and based upon what the witness has told us, and the relevance of it is to show the Defendant will not sign

these forms. This is not the only form that he has refused to sign [i. e., the one] at the Austin State Hospital. He didn't sign a form that was sent to him, a voluntary form."

Under the regulations the registrant is not required to sign the form referred to. The cover document that the board sends with this voluntary form requests the registrant to complete it.

The majority opinion quotes testimony of appellant concerning the meeting with the board and the representative of the State Selective Service Director and appellant's refusal to agree on any type of work. More of the same followed that quoted:

Q. Mrs. Grimes asked you on three occasions as to whether you would agree to choose a type of employment, but each time you refused; is that right?

It is helpful to see testimony additional to that quoted in the majority opinion.

*Miss Follette (Clerk of the Board).*

(After testifying that appellant reported to the board and was told to report to the hospital.)

Q. All right. And what did the Defendant say to you, if anything, about his reporting?

A. He said he would report.

  \*   \*   \*   \*   \*   \*

Q. He did not indicate to you an unwillingness to work at the Austin State Hospital, did he?

A. Yes, he said he would go, but he said that he couldn't fill out an application. He said he would report.

Q. And he said—did he ever tell you that he would not work?

A. No.

*Personnel Officer, Austin State Hospital.*

Q. When an individual who has been ordered to report to the Austin State Hospital as a conscientious objector comes there, is there any form tendered to him to fill out?

A. Yes, sir, a standard application form.

  \*   \*   \*   \*   \*   \*

Q. For what purpose is this form tendered to the conscientious objector, if any?

A. It is tendered to all applicants for employment, sir, regardless. They must complete and sign an application for employment before they can be employed.

*Personnel Clerk, Austin State Hospital.*

Q. What did he [Elizarraraz] say [when he appeared at the hospital]?

A. He said that he had been ordered to report there to go to work.

Plainly this line of questioning was elicited by the government as tending to show a continuing course of arbitrary or illegal refusal. It is equally plain that this is the interpretation placed on it by the major-

  \*   \*   \*   \*   \*   \*

Q. \* \* \* [W]hat conversation did you have with the Defendant, if any?

A. I offered him an application to fill out.

Q. What did he say or do, if anything?

A. He said that he couldn't sign anything.

Q. All right. Did anything else transpire?

A. No, sir.

Q. What did he do after he said he couldn't fill out anything?

A. He left.

  \*   \*   \*   \*   \*   \*

Q. Now, then, you do not recall any conversation about his unwillingness to work; the only thing you recall is that he declined the application; is that right?

A. That's right.

ity. But the registrant is not required to agree. His right to decline to agree is protected. 32 C.F.R. § 1660.20(c) and (d).