Robert E. IANNELLI and Dolores Iannelli, his wife, Plaintiffs,

v.

H. Alan LONG, District Director of Internal Revenue, Pittsburgh, Pennsylvania and Harold T. Swartz, Acting Commissioner of Internal Revenue of the United States of America, Defendants.

Civ. A. No. 71–905.

United States District Court,
W. D. Pennsylvania.

Nov. 3, 1971.

James E. McLaughlin, McArdle, McLaughlin, Paletta & McVay, Pittsburgh, Pa., for plaintiffs.

Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., for defendants.

## OPINION

WEIS, District Judge.

American preoccupation with due process and taxation goes back to the gestation of the Republic. It is not a purely historic interest but a continuing one because the harsh realities of the necessity of collecting revenue and the natural reluctance of the citizen to pay over to the government that which he considers his own has resulted in some rather arbitrary statutory methods of extracting that which is due Caesar.

There is no doubt that Congress has the right to tax an occupation which in and of itself is illegal. But when collection methods and timing become such as to relegate the taxpayer to a choice between a forfeiture and the exercise of his constitutional privilege against self-incrimination, then due process demands cannot be ignored.

Robert Iannelli was indicted in this Court on March 25, 1971 for conspiracy and violation of the gambling laws of the United States.[1] Disposition of preliminary motions in his case is under way and trial must necessarily be delayed because of involved questions

1. Criminal 71–62. 18 U.S.C. §§ 2, 371, 1302, 1342, 1952, 1955.

raised by the many defendants indicted along with him.

■■ On May 7, 1971 Robert Iannelli received an assessment for wagering tax due for the period September, 1969 through June 30, 1971 in the amount of $712,064.41.[2] On May 10, 1971 the name of his wife, Dolores, was added to the assessment.

When the assessments were not paid within ten days as demanded, liens were filed against all property of the plaintiffs, appropriate entries being made in the Prothonotary's Office of the Court of Common Pleas of Allegheny County, Pennsylvania on June 16, 1971. A week later there were seizures of the Iannelli's checking and savings accounts, and the safety deposit box in their names was sealed.

On July 1, 1971 the realty management firm of Ligo & Miller Company was levied upon and ordered to turn over to the Internal Revenue Service all rents from apartment buildings owned by the plaintiffs. The realty firm had previously been employed by the plaintiffs to collect the rents and use the proceeds to pay current amounts due on the mortgages, real estate taxes, and maintenance charges on the property, the remainder to be disbursed to the Iannellis.

An action for an injunction against the government was brought by the plaintiffs in this Court before the Honorable Wallace S. Gourley on July 8, 1971. It was dismissed on August 6, 1971, 329 F.Supp. 1241, by consent of the parties when the government conceded the addition of the wife's name to the assessment had not complied with appropriate regulations and that therefore the liens were not valid.

On that same day, however, the government issued a "jeopardy assessment", renewed all the liens and relevied on the plaintiffs' various bank accounts. The net result is that the liens and levies have been continuous from the time when they were originally instituted in June and July and that the plaintiffs have had no opportunity to secure possession of their property since that time.

On September 16, 1971, the Internal Revenue Service levied on the life insurance policy of the husband plaintiff, Robert Iannelli, and demanded payment from the insurance company of the cash loan value of the contract.

The plaintiffs' home was also liened by the IRS, their automobiles have been made subject to seizure, and the government indicates that an inventory of the furniture in the Iannelli home will also be made preliminary to a tax sale.

It now appears that foreclosure proceedings on the apartment buildings are imminent and although the first mortgage balance is approximately $500,000, there is a substantial equity in the properties above that figure.

The plaintiffs say they do not owe $722,205.18 and cannot pay it.

The assessment is based upon a projection of wagers allegedly accepted by Robert and Dolores Iannelli and rests upon records covering a period of seven days seized by the Pennsylvania State Police on September 20, 1969. In addition, through the use of a wiretap authorized in this Court and which is involved in the criminal proceedings, data was secured for a period of gambling operations between October 21, 1970 and November 2, 1970. A combination of the data for these two periods of time led the IRS to assume that the plaintiffs accepted the following wagers:

| | |
|---|---|
| Baseball | $ 240,911.00 |
| Football | 5,250,696.00 |
| Numbers | 1,200,568.00 |
| Horse Racing | 1,870.00 |
| | $ 6,694,045.00 |

The wagering tax on this estimated figure amounts to $669,404.50, to which

---

2. *See* 26 U.S.C. § 4401, et seq. While the plaintiffs contend that there can be no joint assessment, Compton v. United States, 334 F.2d 212 (4th Cir. 1964) holds otherwise. In a refund action the question of ownership of the business may be for the jury. United States v. Bowen, 411 F.2d 923 (5th Cir. 1969).

was added interest, bringing the total amount to $722,205.18.[3]

The plaintiffs contend that the assessment is arbitrary, capricious and contrary to law. They do not deny that they have received wagers[4] nor do they deny that some tax may be due.

The usual method for obtaining a court review of the amount due is by means of a suit for refund. This requires that the plaintiffs pay the full amount of the assessment and then file a suit in the district court for such amount as they say should be repaid. In the alternative, the taxpayer may file a bond in the total amount of the assessment. The plaintiffs assert that they cannot meet either of these requirements and are therefore prevented from bringing the matter to court.

It appears that in many situations, however, the Government is willing to accept a payment of part of the amount assessed, permit the taxpayer to file a suit for refund of that amount and, during the course of the litigation, have a determination of the correct total which should be paid to the Government.[5] It seems, customarily, that when such a procedure is used, the IRS does not pursue its collection and tax sale proceedings during the course of the litigation. There is no assurance, however, that such restraint will be exercised in this case and, in fact, the plaintiffs contend, via statements from at least one government official, that an unusually aggressive collection policy will be pursued.[6] The Government does not deny that contention or indicate that it would follow its customary practice of forbearance while the refund suit is in progress.

There appears to be nothing in the Revenue Code which would prevent the Government from selling all of the plaintiffs' property during the course of a suit for refund even though this might result in tremendous losses to the plaintiffs by having the properties sold at a much lower price than they would ordinarily command and even though it might be proved later at the trial that the Government's claim was greatly inflated or even not due at all.

Nor do the plaintiffs' problems cease with this difficulty. In order to prevail in a suit for refund, the burden of establishing the correct tax due is upon the taxpayer. The Iannellis, therefore, would be required to prove facts about their operations and income which might directly incriminate them both in the pending federal court suit and perhaps also in a state court action.

To the plaintiffs, therefore, the choice seems to be simple. They either waive their right to be silent under the Fifth Amendment of the Constitution in connection with the criminal case or they must forfeit all of their property down to and including the furniture in their home.

The other side of the case, however, is not without some valid countervailing consideration. The Internal Revenue Service says that its experience has been that when the lien is lifted, property such as that which may be in the safety deposit box disappears and is never seen again. The Service also points out that the plaintiffs here have failed to file a complete inventory of their possessions or to give any assurances that the same would be available in the event that ultimately it is determined that a

---

3. In one part of the record, the amount claimed is said to be $724,950.12 (Tr. p. 10) as of September 20, 1971, the Government claims $756,599.09 (Tr. p. 14).

4. Robert Iannelli pleaded guilty in the state court on January 20, 1970 on charges of illegal gambling. 18 P.S. § 4607.

5. *See* Flora v. United States, 362 U.S. 145, 171 n. 37(b), n. 38, 80 S.Ct. 630, 4 L.Ed. 2d 623.

6. During the course of an interview on a local television station, a former member of the Strike Force in Pittsburgh, obviously referring to the case at bar, discussed the imposition of the assessment in connection with criminal sanctions and admitted, "They might consider it harassment if someone pulled up to your house with a moving van and started to take away your furniture." (Tr. p. 55).

large tax is due. There is nothing in the record to indicate that the Government's position is completely at odds with realities.

The Government argues further that this Court has no jurisdiction because of the provisions of 26 U.S.C. § 7421 which says in part:

"No suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is a person against whom such tax is assessed."

The leading case upon which the defense relies is Enochs v. Williams Packing & Nav. Company, 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292, where the Supreme Court emphasized the restrictive nature of the statute and held in essence that an injunction would be allowed only "if it is clear that under no circumstances could the Government ultimately prevail." *Id.*, at 7, 82 S.Ct. at 1129.

In *Enochs,* supra, the taxpayer had asked for an injunction because it said payment of the total amount of the assessment for an excise tax would drive it into bankruptcy. While the court held that this was not sufficient to justify the issuance of an injunction, it is important that the protection against self-incrimination was not involved and also that the Supreme Court pointed out the fact that a partial payment could be made to provide an opportunity to litigate the whole controversy.

Two cases in the Courts of Appeal have allowed injunctions in cases involving the wagering tax. They are Lucia v. United States decided by the Court of Appeals for the Fifth Circuit on August 23, 1971, 447 F.2d 912 where that court held that, since the statute of limitations for collection of the tax had expired, an injunction would be proper. In Pizzarello v. United States, 408 F.2d 579, the Court of Appeals for the Second Circuit permitted the consideration of an injunction where it appeared that the assessment was based upon evidence seized illegally.

Injunctions, however, were refused in the cases of Cole v. Cardoza, 441 F.2d 1337 (6th Cir. 1971); Trent v. United States, 442 F.2d 405 (6th Cir. 1971); and Collins v. Daly, 437 F.2d 736 (7th Cir. 1971). Hamilton v. United States, 429 F.2d 427 was another decision by the Court of Appeals of the Second Circuit where, however, an injunction was refused on the basis that the statute of limitations for a criminal proceeding was due to run very soon.

Three decisions of the United States Supreme Court in the past few years have a substantial bearing on the situation involved in this case. They are Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889; Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906; and United States v. Coin & Currency, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434. *Marchetti* and *Grosso* dealt with criminal convictions for failure to file wagering tax forms under Section 4401. The Supreme Court held that there could be no criminal convictions because the requirement of filing forms which were later distributed to state officials for use in gambling prosecutions violated the defendant's constitutional rights. In the course of the opinions, the court made it very clear that Congress was free to levy taxes on wagers and collect them in civil proceedings. In concluding the *Marchetti* opinion, the court said, 390 U.S. at page 61, 88 S.Ct. at page 709:

"We emphasize that we do not hold that these wagering tax provisions are as such constitutionally impermissible; we hold only that those who properly assert the constitutional privilege as to these provisions may not be criminally punished for failure to comply with their requirements."

In United States v. Coin & Currency, supra, 401 U.S. at page 717, 91 S.Ct. at page 1043, the court re-emphasized the holding of *Marchetti* and *Grosso* and said:

"In those cases, we took pains to make it clear that the Court in no way

doubted the Government's power to assess and collect taxes on unlawful gambling activities. It was only the method Congress had adopted in collecting the tax that raised the Fifth Amendment question. * * * Since it was only this method of tax collection which was subject to constitutional objection, we indicated that the Government remained free to collect taxes due under the statute so long as it did not attempt to punish the taxpayer for his failure to file the required documents."

In *Coin,* supra, the Government argued that it was simply trying to forfeit money which had been found in the possession of a gambler, that this was civil in nature, and not strictly a criminal case. The Court, however, said at page 718, 91 S.Ct. at page 1043:

"But as Boyd v. United States, 116 U.S. 616, 634, [6 S.Ct. 524, 29 L.Ed. 746] (1886), makes clear, 'proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offences committed by him, though they may be civil in form, are in their nature criminal' for Fifth Amendment purposes."

We recognize that from a purely legal standpoint the proceedings to collect the taxes from the Iannellis in this case do not constitute a forfeiture. However, from a practical standpoint, a tax sale of all property they own without the opportunity to contest it in a court of law is for all intents and purposes a forfeiture. See United States v. Coin & Currency, supra, at page 718, 91 S.Ct. 1041.

In some earlier cases which arose during the prohibition era when Congress was attempting to regulate another illegal activity, the sale of intoxicating liquors, by the use of taxes, the Supreme Court in Lipke v. Lederer, 259 U.S. 557 said, at page 562, 42 S.Ct. 549, at page 551, 66 L.Ed. 1061:

"Before collection of taxes levied by statutes enacted in plain pursuance of the taxing power can be enforced, the taxpayer must be given fair opportunity for hearing—this is essential to due process of law. [citation] And certainly we cannot conclude, in the absence of language admitting of no other construction, that Congress intended that penalties for crimes should be enforced through the secret findings and summary action of executive officers. The guarantees of due process of law and trial by jury are not to be forgotten or disregarded."

In that case the Court held an injunction should have been granted despite the provisions of the anti-injunction law. A similar result was reached in the case of Regal Drug Co. v. Wardell, 260 U.S. 386, 43 S.Ct. 152, 67 L.Ed. 318. While these cases are said to stand for the proposition that the prohibition does not extend to suits brought to restrain collection of a penalty, Miller v. Standard Nut Margarine Co., 284 U.S. 498, 506, 52 S.Ct. 260, 76 L.Ed. 422, we have difficulty in detecting the distinction between the fact situation involved there and in the case at bar. *See also* the concurring opinion of Mr. Justice Brennan in *Grosso,* supra.

We think that justice would not be served by permitting the Government to foreclose and sell all of the taxpayer's property before the matter can be reached for a determination in court. By the same token, we must recognize that the Government's fears that property will disappear before the amount can finally be determined may well have some basis in fact.

One other concept comes into play here. Federal Courts have deferred civil proceedings pending the completion of parallel criminal prosecutions when the interests of justice seemed to require such action. For a listing of representative cases, see United States v. Kordel, 397 U.S. 1, 12 n. 27, 90 S.Ct. 763, 25 L.Ed.2d 1. We believe that the spirit of the holdings in those cases is applicable in the factual situation at bar.

In these circumstances, we conclude that a temporary injunction should issue enjoining the Internal Revenue

Service from executing on its liens until such time as the criminal proceedings have terminated, the criminal statute of limitations shall have tolled, or such earlier event as may occur to protect the rights of the parties. In order to protect the Government's interest in preventing dissipation of the plaintiffs' assets, a Receiver will be appointed to take possession of the rents from the apartment buildings and to disburse the funds to bring the mortgages current, maintain the property and keep the remainder in savings accounts under his control.

Our decision thus is not really to prohibit but only to defer collection of the taxes until such time as the plaintiffs may litigate their tax liability in court just like any other citizen and without giving up their constitutional rights, just like any other citizen.

The defendants' Motion to Dismiss will be denied. An appropriate Order of Injunction will be issued.