Antonio GARCIA–PEREZ, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. Civ. 78–29.

United States District Court,
D. New Jersey.

Aug. 8, 1980.

Supplemental Memorandum
Sept. 16, 1980.

Zuckerman, Aronson & Horn by Carl B. Levy, Newark, N.J., for plaintiff.

Robert Del Tufo, U.S. Atty., by Eric Chase, Asst. U.S. Atty., Newark, N.J., and M. Carr Ferguson, Asst. Atty. Gen., Tax Div., Dept. of Justice, by D. Patrick Mullarkey, Chief, Civil Trial Section Northern Region, and Stephen Lyons, Sp. Atty., Washington, D.C., for defendant.

MEMORANDUM *

BIUNNO, District Judge.

This is a civil suit to recover a refund of taxes assessed and collected as a tax on

---

* While plaintiff's appeal from an earlier final judgment in this case was pending, the United States moved for remand, which was granted, for a hearing on plaintiff's privilege claims under *Matter of Grand Jury* (Markowitz), 603 F.2d 469 (CA–3, 1979). The rulings here published

wagering, 26 U.S.C. § 4401, et seq., and to cancel the remainder of the tax as assessed but not collected. The United States counterclaimed for judgment on the balance of the tax assessed but not collected.

The matter came before the court on motions to compel discovery and for sanctions for failure to provide discovery. The eventual disposition was an order imposing sanctions against plaintiff by dismissing his complaint, and entering judgment for the United States on the counterclaim. Plaintiff appealed.

While the appeal was pending, the United States applied for an order remanding the case to the district court for the conduct of a hearing of the kind described in *Matter of Grand Jury* (Markowitz), 603 F.2d 469 (3rd Cir.1979), and the motion was granted. Further proceedings were conducted at the trial level.

The period involved is from June 1, 1971 to September 30, 1971, or four months. Although the best evidence, namely certified copies of State court documents, are not in the record, it is said in briefs that a search and arrest were made August 12, 1971 by the Union City Police Department. The search was pursuant to a warrant for premises at 410 Palisade Ave., Union City, N.J. The search produced various records for a lottery operation and plaintiff was arrested. At some later date, an indictment was returned charging violation of some applicable New Jersey law on illegal numbers or lottery operations. At some later date, it is said that a State court granted a motion to suppress the evidence obtained on the State search, and eventually the indictment was dismissed. None of the papers in this connection have been made part of the record here, and these facts are temporarily assumed for present purposes.

On September 30, 1971, another search was conducted of the same premises, this time by federal officers on a federal warrant. An indictment followed in this court,

Crim. No. 296–72. Since that file is part of the official records of this court, it has been called for out of storage and inspected by the court.

The indictment was filed April 26, 1972, and named the plaintiff, his wife Maria Elena, and 26 other persons as defendants. The indictment was in three counts. Count 1 charged a conspiracy under 18 U.S.C. § 371 to violate 18 U.S.C. §§ 1952 and 1955 (use of interstate travel or facilities to promote an illegal activity, which includes gambling; and conduct of an illegal gambling operation by 5 or more persons). Count 2 charged substantive violation of § 1952 and § 2. Count 3 charged substantive violation of § 1955 and § 2.

On June 9, 1972, Michael A. Querques, Esq. of 521 Central Avenue, Orange, New Jersey, filed a notice of appearance for both plaintiff and his wife. No later substitution of attorney or appearance by a different attorney appears on the docket or in the file.

On October 4, 1974 orders for dismissal were signed, one for each defendant, on application for leave signed by the U.S. Attorney. All of them recited, as the reason, that "electronic surveillance which comprises a substantial portion of the proof in this case is unlawful under the doctrine stated in U.S. v. Giordano" and that permission to dismiss the indictment was granted by the Department of Justice on August 27, 1974.

After entry of the dismissals, nothing further appears in the file except an order, consented to by James M. Deichert, Esq., Special Attorney, Department of Justice. The order recites that it was on the application of plaintiff for the return of one Model EL–81 Sharp calculator with adapter, owned by him, which had been seized by agents of the FBI acting under a search warrant (copy of which was attached) on September 30, 1971 at 410 Palisade Avenue, Apt. 8–A, Union City, N.J. It recites

are made on that remand. Thereafter, the pending appeal was dismissed under F.R.App.P. 42(b).

that the indictment was dismissed October 4, 1971. It then reads that: "Since no grounds exist for the continued possession by the Plaintiff [sic] of the property of the Defendant", the "property above mentioned" (i.e., calculator) was ordered returned forthwith to the defendant (plaintiff here). The consent order bears the backer of Herbert L. Zuckerman, P.A., 60 Park Place, Newark, New Jersey. There is no formal motion of record, no minute entry of any hearing. As noted above, no substitution appears replacing Mr. Querques with Mr. Zuckerman.

The copy of the search warrant attached to the order includes the return. It discloses that the inventory of property taken pursuant to the warrant was:

1. Twelve bundles of U.S. Currency consisting of 10 bundles of $1,000 each, one bundle with $1,496, and one bundle of $100 (total, $11,596.00).

2. Model EL–81 Sharp mathematical calculator with adapter.

3. One envelope dated 3/3/71 with gambling notations.

4. One bus fare ticket with numbers bets listed.

5. One business card for La Guardia Bakery.

Maria E. Garcia signed a certification that these items were taken on a search at the location indicated on 9/30/71 at 5:45 PM by FBI agents and were the only items taken. Agents Calvin C. Clegg and Robert J. Vonterich witnessed her certification.

The case file in Crim. No. 296–72 discloses no hearing or any order declaring that the search warrant was in any way defective, or suppressing the evidence seized. Several defendants, other than plaintiff and his wife, had filed omnibus motions which included claims of standing to apply for the suppression of evidence and claiming standing to do so, but no entry disclosing that any hearing had been held, and no order of any kind on the subject appears of record before the orders of dismissal.

*U.S. v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), of course, was the decision ruling that court orders for electronic surveillance under 18 U.S.C. § 2518 procedures were invalid when the authorization to apply, specified by 18 U.S.C. § 2516, had been given not by the Attorney General or by an Assistant Attorney General specially designated by him, but by another official in the Department.

This review of the criminal file discloses that the recitals in briefs or at argument, to the effect that the federal search was ruled to be illegal and the evidence obtained suppressed, are simply not the case. There was no such ruling. The only order was the order to return the calculator, and that on the ground that the indictment had been dismissed and the United States had no need for it. No application was made for the return of the $11,596. in cash or for the other items obtained on the search, or for their suppression as evidence.

The $11,596. is the amount set out in the Claim for Refund on which the present suit is based.

This suit, and the position of the United States, arise out of the ruling in *U.S. v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), to the effect that the judicially created exclusionary rule should not be extended to bar use as evidence in a civil proceeding by or against the United States that which was seized by state law enforcement officers, acting in good faith but nonetheless unconstitutionally.

In *Janis*, a state search under warrant was conducted, and gambling records and money were seized. With the information so provided, IRS made an estimate of gambling activity by ascertaining the average daily gross proceeds over the 5-day period dealt with by the seized records, and applying it to the period of 77 days surveillance. The tax, then 10% of the gross wagers (since reduced to 2%) was assessed, and IRS levied on the cash seized by State authorities on the search in partial satisfaction.

Janis was later charged with violation of local gambling laws. He responded with a motion to quash the search warrant and suppress the evidence seized. Relying on

*Spinelli v. U.S.,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), decided after the warrant had issued but before the motion, the State court ruled that the warrant affidavit had not adequately shown underlying circumstances to support an independent finding of reliability of the information supplied by informants. The motion was granted and all evidence seized ordered returned except the cash levied on by IRS.

Janis then filed a claim for refund, and when it was not honored, began suit in the U.S. District Court. The United States answered, and counterclaimed for the unpaid balance of the assessment. On a concession that the United States had relied on information from State officials obtained on the search, as the basis for the assessment, Janis moved to suppress use of that evidence, and to quash the assessment. Looking to *Spinelli* and to *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the trial court granted the motion, ordered refund of the cash levied on, and cancelled the assessment. The Court of Appeals for the Ninth Circuit affirmed. The Supreme Court reversed.

At the outset, the court noted that if the State evidence could not be used, because there would then be (on the record there), a "naked" assessment without any foundation to support it, the usual burden of proof rule in tax cases would not apply, citing *Helvering v. Taylor,* 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935). The court assumed, without deciding, that this consequence would follow, in order to reach the primary issue.

It reviewed the "silver platter" doctrine of *Weeks v. U.S.,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) which barred the use of evidence seized by a federal officer from use at trial of a federal offense where the Fourth Amendment had been compromised, but allowed use in the federal trial of evidence similarly obtained by State officers.

*Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) and *Irvine v. California,* 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561 (1954)

followed. Their net effect was to apply the Fourth Amendment to the States for State proceedings, but with no judicial sanction except in the most extreme case. But the "silver platter" doctrine continued in effect until *Elkins v. U.S.,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), which barred the use in a federal *criminal* trial of illegally obtained evidence provided by the State. This rule was not on constitutional grounds, but in the exercise of supervisory power over the federal courts.

After noting that the exclusionary rule had never been applied by the Court to exclude from a civil proceeding, federal or State, evidence obtained not in compliance with the Fourth Amendment, except for forfeiture cases which were described as quasi-criminal, and after weighing the pros and cons of extending the exclusionary rule, the court concluded that the rule should not be applied to bar the use of the evidence seized by law enforcement agents of one sovereign, in a civil proceeding of another sovereign. The judgment was reversed and remanded for further proceedings, and the court is not aware that the eventual outcome of those proceedings is reported.

*Janis* is still the law, and the consequence is that so long as the United States may use the gambling records obtained by the Union City police, it cannot be said that there was a "naked" assessment without any basis to support it. This being so, plaintiff here faces the burden of proving the amount he is entitled to recover, if at all, under the usual rule for refund suits, *Lewis v. Reynolds,* 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932). He must show more than that the assessment was erroneous in some respects. *Bull v. U.S.,* 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935), and other cases mentioned in *Janis,* 428 U.S. at 440–441, 96 S.Ct. at 3025–3026, appear to support a presumption of correctness to the assessment which is the subject of the counterclaim.

Given this background, what followed here raised issues going beyond *Janis.* The United States early served and filed

written interrogatories for discovery, and the interrogatories were filed with the clerk. Long after the usual time had expired, and without any order to extend the time, plaintiff seems to have served the United States with answers to some interrogatories but not others, and filed nothing with the Clerk. Meanwhile, plaintiff evidently served a document request and written interrogatories with the United States, but never filed them with the Clerk. The United States served its response, including the providing of copies of the gambling sheets or records obtained on the Union City police search and employed by IRS to calculate the daily average of gross wagers (as in *Janis*) and filed the responses with the Clerk.

The matter first arose on a motion by the United States to compel answers, which was granted. When a question of privilege was raised in the briefs and in argument, the court instructed that such answers should be provided to the court alone, under seal, so that the question could be considered. This was not done, and the United States moved for sanctions for refusal to comply with the order. The motion was granted, calling for the entry of judgment for the United States on both the complaint and the counterclaim. The appeal and remand followed.

At the hearing on remand, it appeared from documents handed up and marked as exhibits, that plaintiff had failed to comply with the discovery rules at all, even for questions answered. Aside from lateness and failure to file, plaintiff did not provide the answers he gave under oath, as required, did not raise the privilege against self-incrimination for questions not answered, but merely said "Improper question" or "N/A". If objections were intended, they were not stated, nor were they signed by counsel, as required, nor was any application made for a protective order. In sum, in this case now some 2 years old, plaintiff has utterly disregarded and failed to comply with discovery rules.

Putting that misconduct to the side for the moment, and turning to the belated claim of privilege, it is plain that whatever the truthful answers to the interrogatories may be, plaintiff has no reasonable cause to apprehend a criminal prosecution. The court has nothing beyond the refusal to answer on self-incrimination grounds. The setting in which the questions are asked bears no resemblance to the setting in *Hoffman v. U.S.*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951) or *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). There is no sign of a criminal investigation in progress. No criminal charges or indictments are pending. With only theoretical exceptions, both State and federal statutes of limitation have long since run out. Whatever the State learned from its search cannot be used by it for any State prosecution nor used by the United States for a criminal case in the federal courts. The same is true for criminal prosecutions, federal or state, in the case of whatever was learned by electronic surveillance for the dismissed federal indictment. The period involved is from June 1, 1971 to September 30, 1971, and nothing before or after.

On the face of the matter the court's views are that plaintiff clearly does not reasonably apprehend any criminal prosecution in which the answers called for would have any tendency to incriminate him. Rather, he is raising the claim of privilege solely to strengthen his position, and weaken that of the United States, for the trial of this civil case, possibly trying to protect others (for which purpose the privilege does not apply), and possibly to insulate himself from private retribution by others whose identity and activities could be disclosed by the answers (also not within the privilege).

Plaintiff argues that there is one statute for which his answers could be used, on which limitations have not run. That is the RICO statute, 18 U.S.C. § 1961, et seq. The enacting clause of that Act, § 1962, makes it unlawful for any person who has received any income derived from a "pattern of racketeering activity" to use or invest any part of that income or of its

proceeds to acquire any interest in, or to establish or operate any enterprise engaged in or which affects interstate commerce. The definition of a "pattern of racketeering activity" is found in § 1961(5), which declares that the term

"requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter [October 15, 1970] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

"Racketeering activity", defined in § 1961(1), includes any act indictable under (among other things), 18 U.S.C. § 1084 (transmission of gambling information), 18 U.S.C. § 1952 (use of interstate travel or facilities to promote gambling), and 18 U.S.C. § 1955 (conduct of an illegal gambling activity by 5 or more persons).

Thus, the argument runs, if the answers disclose a "racketeering activity" by plaintiff during the months of June through September, 1971, those answers could be a clue, or a link in the chain, of evidence of a "pattern" of racketeering activity if evidence should otherwise be obtained of another such act within 10 years after September 30, 1971.

The United States suggests that the solution is simple, namely to stay the suit until after September 30, 1981, as some courts have done under the circumstances. The answer is not that simple, because if plaintiff's analysis be correct, no matter how remote or theoretical it may be, another 5 years would need to run *after* September 30, 1981 under the general statute of limitations, 18 U.S.C. § 3282.

As the RICO statute is drawn, there may never be a time when a court can be certain that a prosecution under RICO cannot make use of answers about the 1971 period. This is because the definition of a "pattern", quoted above, speaks of *at least two acts*, one occurring after the law took effect, and the *last* of which occurred within 10 years after *a prior act*. This language, on its face, can support a RICO

prosecution grounded on an endless series of acts, each within 10 years of the other. In fact, the language does not even require that it be the *first* act relied on that occurs after the effective date. Any act after the effective date, even though it be the last one relied on, evidently can be shown along with earlier *prior* acts within 10 years, even though the prior act was before the effective date.

Thus, as a matter of interpreting the RICO statute together with the general statute of limitations, there can be no date (until defendant dies) after which it can be said with confidence that a RICO charge could not make use of answers given in regard to 1971 activity. It would be necessary to *know*, on an inquiry made after 10 years have expired from September 30, 1971, that plaintiff had not over the entire 10 year period, done any of the many acts listed in § 1961(1) as constituting a racketeering activity. There are no means to achieve such an answer, either now or then, and so the problem is from a purely legal standpoint, an intractable one, i.e., incapable of solution.

As noted above, all of this is remote, theoretical and unreasonable as a basis for apprehension on the part of plaintiff. It is there in principle and theory, given no facts whatever.

The same is true of *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). That case is noteworthy for its extension of the Fifth Amendment privilege against self-incrimination to the States through the Fourteenth Amendment. It cannot be said, in any real sense, that the questions asked of Malloy at the Connecticut inquiry into gambling had any tendency to incriminate him. The questions were directed to activities for which Malloy had already been charged and convicted. Malloy could not be again charged or tried, since that would put him in jeopardy twice, a point nowhere discussed. Yet, absent a holding that answers to the questions would tend to incriminate him, the issue of extending the Fifth Amendment to the States could not be reached. The court

overcame this problem by deciding that even where the questions dealt with the activities of others, Malloy

"might apprehend that if this person were still engaged in an unlawful activity, disclosure of his name might furnish a link in a chain of evidence sufficient to connect [Malloy] with a more recent crime for which he might still be prosecuted." 378 U.S. at 13, 84 S.Ct. at 1496.

This theory, like the RICO statute, utterly bars any holding in any case that there is no ground for apprehension because the statute of limitations has run. Since questions about activities within the statute of limitations obviously cannot be pressed, *Malloy* teaches that questions about periods for which the statute has clearly run are also barred because the answers may provide a link in the chain of evidence on a more recent activity for which the statute has not run.

The net result of RICO and *Malloy* is that in practical effect a witness or party need only assert the privilege, and there is no effective way in which a trial court can rule, with confidence, that it clearly appears that there is no reasonable ground for apprehension. The principle that the right to the privilege is for the court and not the witness has thus been reduced to a meaningless theory.

In fact, if plaintiff were really of a mind to try this case with the usual discovery and other preparation, and yet be protected from use of his answers against him, it would only be necessary to answer after having been ordered to do so. If he truly had a privilege, his answer in compliance with the order would have been an answer wrongfully compelled, and the evidence so adduced could not be used against him. See proposed Fed.Ev.Rule 512 (not adopted) embodying this well-established principle, as discussed in the Advisory Committee's Note referring to *McGuire, McCormick* and *Wigmore*.

Going back to when the matter first came up, the record shows that it was treated on the basis of failure to provide discovery rather than as a matter involving a claim of privilege by way of objection to particular questions. With the fuller record developed at the later hearings, it appears that the failure to comply with discovery requirements were even more extensive than at first appreciated, as detailed above, and that no objection grounded on privilege had been made and signed by counsel, served and filed, and a protective order sought. On that ground alone, it may well follow that the existing final judgment should be allowed to stand.

The reported cases in this field, which are few, suggest that a different approach should be taken.

In *Thomas v. U.S.*, 531 F.2d 746 (CA5, 1976), Texas officers made an arrest and seized records of a gambling operation. Using the records seized, I.R.S. made a jeopardy assessment for the wagering tax for 10 monthly periods, and then collected part of it by seizure. Thomas filed a claim for refund and began suit, grounded in part on the claim that the records seized belonged to others. The United States answered and counterclaimed for the balance of the assessment. The United States then served interrogatories, evidently much like those here, but Thomas failed to answer or object. A motion to compel answers was filed, but before hearing answers were filed to some questions, while others were declined (a) because the answers "may tend to incriminate" and (b) because the activity of Thomas was "as a bettor, not as a bookmaker, agent or layoff man." It was further claimed that disclosure of the bookmakers with whom he dealt would probably "be dangerous and injurious to his health."

A fresh motion to compel answers was filed, and Thomas applied for a protective order. The court ordered the questions answered within 10 days. When he did not obey, the court dismissed his action and entered judgment for the government on the counterclaim on the reasoning that Thomas had to choose between keeping his silence and pressing the lawsuit.

On appeal, the ruling was reversed. It felt that where the disobedience is on self-

incrimination grounds, the sanction for failure to provide discovery ought not to go so far as to deprive him of the right to shoulder his burden of overcoming the strong presumption of correctness of the assessment. The court pointed to *Shaffer v. U.S.*, 528 F.2d 920 (CA 4, 1975), where a procedure was established to order a stay until the government provided immunity to the taxpayer or until all applicable statutes of limitations had run. It referred to *Ianelli v. Long*, 487 F.2d 317 (CA3, 1973), which it read as indicating that a stay until the conclusion of related criminal proceedings or until all applicable statutes of limitations had run, would suffice. The case was remanded without adopting a specific procedure, but leaving it to the trial court to exercise the wide discretion it has both under Rule 37 and outside that rule.

Five years later, in *U.S. v. Ayers*, 615 F.2d 658 (CA 5, 1980), a forfeiture proceeding was begun against both Mr. & Mrs. Ayers. Again, interrogatories were served, and Mr. Ayers moved to stay until the related criminal proceedings (he had been convicted and an appeal was pending) were concluded and until applicable statutes of limitations had run. A general stay was denied, but a limited one granted pending the outcome of the appeal. The conviction was affirmed and the United States moved to compel discovery, whereupon Mr. Ayers filed answers to some questions and claimed the Fifth Amendment to questions about the sources of the seized funds and about his income.

Meanwhile, Mrs. Ayers had never answered the interrogatories served on her, and had made no motion for stay. It was not until 3 days after the pretrial conference that she answered by claiming her privilege and declining to specify the source of the funds or of her income. The court said she "never stated the basis for claiming her privilege", but in footnote 3 indicates that at oral argument her new attorney said he thought there might be tax ramifications.

A trial was conducted on the basis of documents submitted, including the record of the criminal case, and judgment was entered for the United States, and both Ayers' appealed.

Thereafter Mr. Ayers died. His death, of course, mooted all issues grounded on self-incrimination. As to Mrs. Ayers, the court ruled it would not resolve an issue not presented to the district court, i.e., whether or not a stay or grant of immunity should have been awarded to Mrs. Ayers. Thus, although there was no judgment grounded on discovery sanctions, the end result was the same—an affirmance of the judgment as to both the Ayers.

In passing, the court made reference to *Virgin Islands v. Smith*, 615 F.2d 964 (CA 3, 1980) as well as to *Ianelli* and *Thomas*.

*Ianelli v. Long*, 487 F.2d 317 (CA 3, 1973) involved a different aspect of the subject. Ianelli had been indicted for conspiracy to violate gambling laws of the United States. Based on information obtained by Pennsylvania State Police and from federal wiretaps, IRS calculated gross wagers and the wagering tax, made assessments, filed liens, and began proceedings to enforce the liens. The Ianelli's sued, not for refund but to enjoin the United States from conducting sales under the liens. Unlike the *Thomas* and *Ayers* cases, and unlike this case, the Ianelli's did not deny they had received wagers, nor that some tax may be due. They claimed that the assessment was arbitrary, capricious and contrary to law. Despite the provisions of 26 U.S.C. § 7421, the trial court entered a preliminary injunction against executing on the liens until all criminal proceedings (then in progress) had terminated, the statute of limitations had run, or some other earlier event occurred to protect the interests of the parties. A receiver was also appointed to manage a mortgaged apartment building, see 333 F.Supp. 407 (D.Pa., 1971). This was on the theory that to relegate the Ianelli's to a suit for refund, they would be required to prove facts about their operations and income which might incriminate them in the pending federal criminal trial and perhaps State trials as well.

On appeal, the ruling was reversed on the basis of 26 U.S.C. § 7421. While recognizing the trial court's concern about the dilemma of choosing between forfeiting their property without contesting the assessments on the one hand, and incriminating themselves in a tax refund suit by admitting an illicit enterprise for which they had been indicted the court felt that a tax refund claim and a complaint adequate to toll the statute of limitations could be prepared without damaging admissions concerning the details or nature of the business, and that further proceedings in such a suit would properly be deferred until conclusion of the criminal trial or until the running of all applicable statutes of limitations on prosecutions.

In the present case, unlike *Thomas, Ayers* and *Ianelli*, there is no pending criminal prosecution. Both the State and the federal prosecutions related to the period involved have been dismissed years ago, and the applicable statutes of limitations have run out except, as noted, for the RICO statute and the *Malloy* problem.

A further difference is that in this case plaintiff evidently signed a power of attorney authorizing an accountant to prepare, sign and file his claim for refund, and the agent did so, reciting, among other facts in support, the claim that plaintiff was not engaged in any way in a taxable gambling action at any time during 1971. The same assertion is made in the complaint. Not only that, but plaintiff answered (though not under oath) a question about his sources of income by attaching a copy of his Form 1040 Income Tax Return for 1971. As to that question, no objection was raised, and if there were any ground to object, it clearly has been waived. Yet, if the return was wilfully false (as, by not reporting income from gambling) the statute has long since run on any criminal prosecution for that offense and, by failing to answer under oath, no perjury charge can be grounded on the falsity, if it be false, of the answer given now.

The state courts seem to have dealt with the problem of discovery and the conflict with self-incrimination, see *Mahne v. Mahne,* 66 N.J. 53, 328 A.2d 225 (1974) and *Costanza v. Costanza,* 66 N.J. 63, 328 A.2d 230 (1974), which discuss rulings in other jurisdictions. The suggested remedy is an order putting the party to a decision, at an early stage, whether to answer, or else (having chosen to remain silent) be barred from testifying at trial, subject to adverse comment thereon to the fact-finder. A requirement to provide a list of all other witnesses to be relied on at trial is also mentioned.

None of these devices appear to this court to be desirable, effective or suitable to this case. It is already about 9 years since the events in issue. Even in the ordinary course, it would be difficult enough to conduct discovery and gather witnesses with reliable memories. A stay would aggravate the process.

Barring plaintiff from offering his own testimony at trial is also unsatisfactory. Such a course deprives the fact-finder of an important source of information and handicaps the search for truth.

■ The only course that is rational is one that permits the matter to proceed in the regular way, without impedance or hindrance. That object can only be achieved by ordering the United States to obtain authority for an order under 18 U.S.C. § 6002, for testimony in regard to the period June 1 to September 30, 1971, as to both plaintiff and his wife. The subject matter should be restricted to activities related to those for which the tax may be assessed. If the United States is unable, or declines, to obtain authority for such an order, then an order to like effect will be entered by the court under the authority of *Virgin Islands v. Smith.* As a balancing provision, and to assist the search for truth, the United States will be allowed, on cross-examination or on rebuttal, to use any evidence in its possession that otherwise might be barred by 18 U.S.C. § 2515.

Plaintiff is directed to file a certification, on or before August 29, 1980, that upon the making of an order to answer pursuant to 18 U.S.C. § 6002 or to *Virgin Islands v.*

*Smith,* he will comply therewith at all stages of discovery and trial, or else that he will continue to assert his claim of privilege despite such order. In the latter event, the court will allow the present judgment to stand. Otherwise, it will reopen the judgment, set schedules and allow the case to proceed in the usual way.

### SUPPLEMENTAL MEMORANDUM

■ On August 8, 1980, the court signed a Memorandum in which, after considering plaintiff's claims of privilege against self-incrimination, it concluded that the only course available to provide a fair trial of the issues was to direct the United States to obtain authority for an order under 18 U.S.C. § 6002, tailored to the circumstances of this case, and if unable or unwilling to do so, to enter a like order, judicially fashioned, under the authority of *Virgin Islands v. Smith,* 615 F.2d 964 (CA 3, 1980). See, also, *In the Matter of Grand Jury,* (Markowitz), 603 F.2d 469, at 474–475 (CA 3, 1979) and *U.S. v. Herman,* 589 F.2d 1191 at 1204 (CA 3, 1978), which presaged *Smith.*

Plaintiff was called upon to file a certification indicating whether he would answer questions, given an order under 18 U.S.C. § 6002 or an order under *Smith,* or whether, despite such order, he would continue to decline to answer on 5th Amendment grounds. On the last day for filing the certification, plaintiff's attorney wrote to ask clarification of a provision that as a balancing provision, the United States would be allowed, on cross-examination or rebuttal, to use any evidence in its possession that might otherwise be barred by 18 U.S.C. § 2515.

By memorandum dated September 2, 1980, the court noted *U.S. v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) *, and set an extended date of September 15, 1980 by which plaintiff's certification was to be filed.

On September 15, 1980, plaintiff's attorney delivered a letter to the court. In that letter the view previously expressed disagreeing that *Virgin Islands v. Smith* would support an order is repeated. It is also said that plaintiff declines to provide a certification grounded on a § 6002 order because such an order has not been entered, and the question is not yet ripe for plaintiff to decide. Copy of that letter is attached for the record.

There is an ancient maxim that equity regards as done that which ought to be done. The earlier rulings make clear that plaintiff and his wife will both be protected against the use of any answers to interrogatories, testimony or other information provided in this case, except for a prosecution for perjury, giving a false statement, or otherwise failing to comply with an order entered either under § 6002 or under *Virgin Islands v. Smith.* They made clear that the court would enter an order of this kind, and called on the plaintiff to certify whether he intended to comply with such an order, or to continue to decline to answer.

In these circumstances, it is unnecessary to perform the exercise of entering the order. This is not a case where the issue cannot be tested short of an adjudication of contempt for failure to comply with the order. The case already has a final judgment, from which an appeal has been taken, and the case remanded for further proceedings which have been conducted.

The court will act as though the order had been entered and plaintiff, although now fully protected in respect to his Fifth Amendment right against self-incrimination, is taken as unwilling to testify or provide information. The final judgment already entered will be allowed to stand, and the legal dispute, full articulated by the record, can be taken up before the Court of Appeals.

* After remand, 625 F.2d 1311 (CA–5, 1980), cert. den. 450 U.S. 995, 101 S.Ct. 1697, 68 L.Ed.2d 195

(1981).